719 A.2d 119 (1998)
351 Md. 554
Shanita L. MATTHEWS et al.
v.
AMBERWOOD ASSOCIATES LIMITED PARTNERSHIP, INC. et al.
No. 74, September Term, 1997.
Court of Appeals of Maryland.
October 7, 1998.
Reconsideration Denied November 12, 1998.
*120 Melvin J. Sykes (C. Christopher Brown, Andrew D. Freeman, Lauren E. Willis, Brown, Goldstein & Levy, L.L.P., all on brief), Baltimore, for Petitioners.
E. Dale Adkins, III (Gregory L. VanGeison, Anderson, Coe & King, L.L.P., on brief), Baltimore, for Respondents.
M. Albert Figinski, Weinberg & Green, L.L.C., Baltimore, for the Apartment Builders and Owners Council of the Home Builders Ass'n of Maryland, the Maryland Multi-Housing Ass'n, Inc., and the Property Owners Ass'n of Greater Baltimore, Inc., Amici Curiae.
Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and DALE R. CATHELL, Judge (Specially Assigned).
ELDRIDGE, Judge.
We issued a writ of certiorari in this tort case primarily to decide the issue of whether a landlord of an apartment complex owes a duty to social guests of a tenant who, while in the tenant's apartment, are injured or killed by a highly dangerous pit bull dog kept by the tenant, when the landlord knew of the dog's presence and was aware of the dog's dangerousness, when the presence of the dog was in violation of the lease, and where the landlord could have taken steps to abate the danger.

I.
Shelly Morton leased apartment A-1 in an apartment building located at 6012 Amberwood *121 Road, Baltimore, Maryland, from October 9, 1993, through October 31, 1994. The apartment building was managed by the defendant Monocle Management, Ltd. and owned by the defendant Amberwood Associates Limited Partnership, Inc. The lease Morton signed contained the following provisions:
"The Landlord agrees to lease to the Applicant(s) the above specified apartment so long as Applicant(s) qualify for tenancy under the criteria established by the owners of the apartment project.

* * * * *

"HOUSE RULES
"The resident agrees to comply with the following rules and regulations which shall be deemed to be part of the lease. Breach of these rules and regulations shall be deemed to be a default of the lease.

* * * * *
"18. Not to have any pets on the premises."
It is undisputed that Morton kept her boyfriend's dog, a pit bull named Rampage, in her apartment. Sometimes she kept the dog chained outside, on the grounds of the apartment complex. The dog was not normally aggressive toward persons when Morton was present, but, when she was absent, Rampage would attempt to attack people in his vicinity. In the trial court below, several employees of the defendants testified about dangerous encounters involving the dog, that the dog was "vicious," and that the incidents involving the dog were reported to the defendants' resident manager or the manager on duty.
William Wenger, a maintenance supervisor employed by the defendants, testified that on two occasions he was unable to complete service calls in Morton's apartment because of the dog, that "it was a vicious dog," that on both occasions he immediately reported the incidents to the manager of the apartment complex, and that on both occasions he wrote the reason for his failure to complete the service calls on the service ticket. Wenger also testified that porters were unable to pick up trash behind the apartment building when Rampage was chained behind the building because "[t]he dog came after them." One of the porters, Ray Hall, corroborated Wenger's testimony and stated that he reported the matter to the resident manager of the apartment complex.
David Jones, a maintenance technician employed by the defendants, testified that in the fall or early winter of 1993-1994, when he was attempting to perform maintenance duties in Morton's apartment, he was unable to do so because the dog "jumped at me ... and, you know, lunged at me." Jones stated that he reported the incident to the manager on duty at the time.
Another maintenance technician employed by the defendants, Phillip Monroe, testified about several incidents when he observed Rampage exhibiting aggressive behavior, both in Morton's apartment and when the dog was chained outside. Monroe stated that he promptly reported each incident to the manager. Included were incidents when Rampage "jumped at me ... like he wanted to get to me" and when Monroe had to "jump a fence to get away from the dog." Monroe also testified about seeing an incident when Rampage was chained outside and a boy
"was coming down the walkway and ... the thing snapped and the boy ran and he jumped the other fence at the end of the west side of the back and tried to get up to the second floor of the balcony. The dog was on him."
Monroe stated that he immediately ran to the office and told the manager that the "pit bull was after a guy in the back." Monroe further testified that the dog would regularly growl at children in the area. According to Monroe, the various incidents he testified about occurred over a two month period.[1]
On February 9, 1994, Shanita Matthews and her 16-month-old son Tevin Williams visited Morton and Morton's 5-year-old son *122 Darnell at Morton's apartment. The children were playing together in the living room, and the adults were seated at the dining room table putting together a puzzle when Morton was called away from the apartment. Shortly after Morton left the apartment, Rampage attacked Tevin. Rampage grabbed Tevin by the neck and was shaking him back and forth. Matthews was unable to free Tevin from Rampage's jaws. Matthews then called 911 and yelled for Morton to assist her.
Morton reentered the apartment and was also unable to free Tevin. She grabbed a knife, and, while Matthews held Tevin in her arms, Morton repeatedly stabbed Rampage causing the animal temporarily to release Tevin. Rampage continued to bite Tevin, however, until Morton finally was able to put the dog out of the apartment through the back door. By this time the ambulance had arrived, and Morton took Tevin from Matthews and ran with him to the ambulance.
Matthews then tried to exit the house through the front door, but Rampage had run to the front door of the apartment. According to Matthews, "I had to hold the door tight so he wouldn't get in and get me or ... Darnell." Morton then returned to the apartment, and Matthews was able to leave the apartment and join Tevin in the ambulance. Approximately one hour after arriving at the hospital, Tevin died from his injuries.
In September 1994, the present action was filed in the Circuit Court for Baltimore City against Amberwood and Monocle. Count I of the complaint was a wrongful death action pursuant to Maryland Code (1974, 1995 Repl. Vol., 1997 Supp.), ง 3-904(a) of the Courts and Judicial Proceedings Article, on behalf of Matthews and Andre T. Williams, Tevin's father. Count II was a survival action, pursuant to Code (1974, 1991 Repl.Vol., 1997 Supp.), ง 7-401(x) of the Estates and Trusts Article, by Matthews as personal representative of Tevin's estate. Count III was brought by Matthews, individually, and alleged that she suffered shock, fright, alarm, anxiety, emotional distress, and physical and psychological pain and suffering as a result of Amberwood's and Monocle's negligence. The final count requested relief for the defendants' "reckless infliction of emotional distress" upon Matthews.
The defendants' answer, filed in October 1994, generally denied all of the plaintiffs' allegations and asserted that Matthews failed to state a claim for which relief could be granted. In late October 1995, three days prior to the scheduled trial date, the defendants filed an amended answer that, inter alia, added the affirmative defenses of contributory negligence and assumption of risk. Prior to the commencement of the evidentiary portion of the trial, the circuit court, on a motion by Matthews, struck the portions of the amended answer alleging contributory negligence and assumption of risk. The court also granted the defendants' motion to bifurcate the liability and damages portions of the trial.
The liability phase of the trial began in early November 1995, and spanned three days of testimony. At the close of all testimony the defendants moved for judgment on all counts. The court denied the motion as to counts I and II. The court granted the motion as to count III, stating that "no physical injuries ... occurred in this case to" Matthews and that, under a negligence count, Matthews could not recover for emotional distress. The court permitted count IV to go to the jury as a count asserting an intentional infliction of emotional distress claim, based upon the emotional distress suffered by Matthews prior to Tevin's death.
The jury found Amberwood and Monocle liable on all counts submitted to the jury. Following the damages phase of the trial, the jury awarded damages as follows: $5,018,750 to Matthews and $562,100 to Williams for the wrongful death of Tevin; $600,000 non-economic damages and $4,147.52 compensatory damages to Tevin's estate under the survival action; and $1,110,000 to Matthews as damages for "intentional infliction of emotional distress prior to the death of Tevin Williams." Several motions were filed subsequent to the jury's verdict. The court granted the defendants' motion for judgment notwithstanding the verdict on the intentional infliction of emotional distress count, reduced the noneconomic damages award in the survival *123 action to $350,000, and denied all other motions.
Both sides appealed, and the Court of Special Appeals reversed the judgment in favor of the plaintiffs, holding that, under the circumstances, the defendants owed no duty to the social invitees of a tenant. Amberwood v. Matthews, 115 Md.App. 510, 513, 694 A.2d 131, 133 (1997).
The plaintiffs filed in this Court a petition for a writ of certiorari, and the defendants filed a cross-petition for a writ of certiorari. We granted the plaintiffs' petition and denied the defendants' cross-petition. Matthews v. Amberwood, 347 Md. 155, 699 A.2d 1169 (1997). The plaintiffs' petition presented the following questions:
"I. Does a landlord owe a duty of care to visitors when the landlord has knowledge of a vicious animal on its premises and the ability to take reasonable steps to protect against the animal?
"II. Can a mother recover in a negligence action for her emotional distress from a vicious dog's attack on her child when she was in the zone of danger and held her child in her arms during the attack?
"III. Did the Court of Special Appeals err in mandating a jury instruction on intervening, superseding causes under the facts of this case?"

II.
As summarized by Chief Judge Murphy for this Court, "[i]n order to state a cause of action in negligence, the plaintiff must show the following: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." Rosenblatt v. Exxon, 335 Md. 58, 76, 642 A.2d 180, 188 (1994). See also Shields v. Wagman, 350 Md. 666, 672, 714 A.2d 881, 884-885 (1998); B G & E v. Flippo, 348 Md. 680, 700, 705 A.2d 1144, 1153-1154 (1998); Richwind v. Brunson, 335 Md. 661, 670, 645 A.2d 1147, 1151 (1994). The question in the instant case focuses upon the first of these factors, namely whether the defendants Amberwood and Monocle owed Matthews and Tevin a duty of abating the dangerous condition consisting of a vicious pit bull dog being in the apartment. The plaintiffs contend that Rampage constituted a known dangerous condition upon the property and that the defendants retained control over the presence of the pit bull within the leased premises through the "no pets" clause in the lease. Thus, the plaintiffs argue that the defendants had a duty of care to protect Matthews and her son from that extremely dangerous animal.
Under our cases, whether a landlord owes a duty to his or her tenants and their guests with respect to dangerous or defective conditions on the property, of which the landlord has notice, depends upon the circumstances presented. In a multi-unit facility, the landlord ordinarily has a duty to maintain the common areas in a reasonably safe condition. Very recently, in Shields v. Wagman, supra, 350 Md. at 673-674, 714 A.2d at 884, Judge Chasanow for the Court set forth this principle as follows:
"`[W]here a landlord leases separate portions of his property to different tenants and reserves under his control the passageways and stairways, and other parts of the property for the common use of all the tenants[,] he must then exercise ordinary care and diligence to maintain the retained portions in a reasonably safe condition.' Langley Park Apts. v. Lund Adm'r, 234 Md. 402, 407, 199 A.2d 620, 623 (1964). Our recognition of landlord liability in common areas is generally premised on the control a landlord maintains over the common areas." (Footnote omitted).
The duty to maintain these areas in a reasonably safe condition extends not only to the tenant but "includes the members of his family, his guests, his invitees, and others on the land in the right of the tenant." Landay v. Cohn, 220 Md. 24, 27, 150 A.2d 739, 741 (1959). "It has been held that a child on the land at the invitation of the child of the tenant is entitled to the benefit of the landlord's obligation in this respect." Landay v. *124 Cohn, supra, 220 Md. at 27-28, 150 A.2d at 741.
Other cases recognizing that the landlord owes a duty to maintain common areas in a reasonably safe condition include, e.g., Scott v. Watson, 278 Md. 160, 169, 359 A.2d 548, 554 (1976) (holding that a landlord may have a duty to exercise reasonable care for the safety of its tenants in common areas); Macke Laundry Service Co. v. Weber, 267 Md. 426, 433-436, 298 A.2d 27, 31-32 (1972) (holding a landlord liable for injuries sustained in the laundry room of an apartment complex); Stein v. Overlook Joint Venture, 246 Md. 75, 81-82, 227 A.2d 226, 230-231 (1967) (landlord liable for injuries to a social guest where the landlord had knowledge of a dangerous condition but failed to take preventative steps to ensure a child's safety); Langley Park Apartments v. Lund, 234 Md. 402, 410, 199 A.2d 620, 624 (1964) (holding a landlord liable for injuries sustained by a tenant who slipped on an icy sidewalk); Sezzin v. Stark, 187 Md. 241, 248, 49 A.2d 742, 745 (1946). See also RESTATEMENT (SECOND) OF TORTS ง 360 (1965).
On the other hand, the duty which a landlord owes to a tenant, and the tenant's guests, within the tenant's apartment or other leased premises, is constrained by the general common law principle
"[t]hat where property is demised, and at the time of the demise it is not a nuisance, and becomes so only by the act of the tenant while in his possession, and injury happen during such possession, the owner is not liable; but, Second. That where the owner leases premises which are a nuisance, or must in the nature of things become so by their user, and receives rent, then, whether in or out of possession, he is liable." Owings v. Jones, 9 Md. 108, 117-118 (1856).
See also Smith v. Walsh, 92 Md. 518, 528-529, 48 A. 92, 92-93 (1901). Thus, a landlord is not ordinarily liable to a tenant or guest of a tenant for injuries from a hazardous condition in the leased premises that comes into existence after the tenant has taken possession. See Marshall v. Price, 162 Md. 687, 689, 161 A. 172 (1932) ("The law is well settled that, when the owner has parted with his control, the tenant has the burden of the proper keeping of the premises, in the absence of an agreement to the contrary; and for any nuisance created by the tenant the landlord is not responsible").
As with most general principles of law, however, this principle, that a landlord is not responsible for dangerous conditions in the leased premises, is not absolute and has exceptions. For example, where a landlord agrees to rectify a dangerous condition in the leased premises, and fails to do so, he may be liable for injuries caused by the condition. See, e.g., Sacks v. Pleasant, 253 Md. 40, 44-46, 251 A.2d 858, 861-862 (1969) (landlord held liable for injuries caused by a defective toilet seat where the landlord promised but failed to repair the same); Farley v. Yerman, 231 Md. 444, 448, 190 A.2d 773, 775 (1963) ("a tenant ... may maintain an action for injuries sustained as a result of an uncorrected defect ... if there was a contractual obligation to repair the particular defect and a reasonable opportunity to correct it.... A promise made in the face of a threat to move or a request by the landlord that the tenant remain creates a contract supported by consideration"). If a landlord, although not contractually obligated to do so, voluntarily undertakes to rectify a dangerous or defective condition within the leased premises, and does so negligently, the landlord is liable for resulting injuries. Miller v. Howard, 206 Md. 148, 155, 110 A.2d 683, 686 (1955); Miller v. Fisher, 111 Md. 91, 94, 73 A. 891, 892 (1909) ("although a landlord, in the absence of a covenant to that effect, is ordinarily not bound to repair, yet if he assumes to do so, and performs the work so negligently as to cause an injury thereby, he is responsible"). Defective or dangerous conditions in the leased premises which violate statutes or ordinances may also be the basis for a negligence action against the landlord. See, e.g., Richwind v. Brunson, supra, 335 Md. at 671, 645 A.2d at 1152 (adopting RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT ง 17.6 (1977)).
Just last month, in Shields v. Wagman, supra, this Court held that landlords of a strip shopping center may be liable for injuries sustained by a business invitee and a *125 tenant when they were attacked by a pit bull dog owned by another tenant and kept on the leased premises. The injuries in Shields occurred in a common area, the parking lot of the shopping center, on two occasions when the pit bull escaped from the leased premises. Stating that "[o]ur recognition of landlord liability in common areas is generally premised on the control a landlord maintains over the common areas," 350 Md. at 674, 714 A.2d at 884, this Court reversed a judgment for the landlords. In so doing, we expressly left open the issue in the present case, saying (350 Md. at 673, 714 A.2d at 884): "Because the injuries in the instant case occurred in the common area, we need not decide what liability might have been imposed had the injuries occurred inside the leased premises where Maryland law is less settled."
The principal rationale for the general rule that the landlord is not ordinarily liable for injuries caused by defects or dangerous conditions in the leased premises is that the landlord "has parted with control," Marshall v. Price, supra, 162 Md. at 689, 161 A. at 172. Moreover, as illustrated by the Shields opinion, a common thread running through many of our cases involving circumstances in which landlords have been held liable (i.e., common areas, pre-existing defective conditions in the leased premises, a contract under which the landlord and tenant agree that the landlord shall rectify a defective condition) is the landlord's ability to exercise a degree of control over the defective or dangerous condition and to take steps to prevent injuries arising therefrom. See, e.g., Scott v. Watson, supra, 278 Md. at 165-166, 359 A.2d at 552 (landlord may be liable for "injuries sustained by tenants as a result of criminal acts committed by others in the common areas within the landlord's control"); Macke Laundry Service Co. v. Weber, supra, 267 Md. at 431, 298 A.2d at 30 ("Our decisions have consistently held a landlord liable for ... failure to remedy defects ... over which he retains control"); Langley Park Apartments v. Lund, supra, 234 Md. at 407, 199 A.2d at 623 (where the landlord "reserves under his control the passageways and stairways, and other parts of the property for the common use of all the tenants he must then exercise ordinary care and diligence to maintain the retained portions in a reasonably safe condition"); Elmar Gardens, Inc. v. Odell, 227 Md. 454, 457, 177 A.2d 263, 265 (1962) (landlord has a duty with regard to areas "under his control"); Landay v. Cohn, supra, 220 Md. at 27, 150 A.2d at 740-741 (same).
Moreover, the principle that the landlord may have a duty with regard to matters within his control extends beyond common areas; it may be applicable to conditions in the leased premises. In Commercial Realty Co. v. National Distillers Products Corp., 196 Md. 274, 278-280, 76 A.2d 155, 157 (1950), the Court rejected the landlord's contention "that, inasmuch as the valve was located on the premises leased to the appellee, it was under no duty to turn it off, or to take any action that might prevent the water in the main pipe from freezing...." Chief Judge Ogle Marbury for the Court explained that
"the landlord is liable for injuries to a tenant, and to any other person rightfully on the [leased] premises, caused by the landlord's neglect to remedy defects in, or by his improper management of, appliances of which he retains control, and has been held liable for injuries caused by leakage from water pipes or other plumbing attachments in his control." 196 Md. at 279, 76 A.2d at 157, emphasis added.
See also 1 Tiffany, Landlord and Tenant, งง 91-92 at 641-646 (1910).
Turning to the case at bar, the landlord also retained control with respect to the extremely dangerous condition in Morton's apartment. The tenant Morton did not have exclusive control over the leased premises because the lease gave the landlord a degree of control. The landlord retained control over the presence of a dog in the leased premises by virtue of the "no pets" clause in the lease. The lease plainly stated that breach of the "no pets" clause was a "default of the lease."[2] Such a default would enable *126 the landlord to bring a breach of lease action to terminate the tenancy pursuant to Code (1974, 1996 Repl.Vol., 1997 Supp.), ง 8-402.1 of the Real Property Article. Even before bringing such an action, the landlord, when it first received notice of the dangerous incidents involving Rampage, could have informed Morton that harboring the pit bull was in violation of her lease, could have told her to get rid of the aggressive animal, and could have threatened legal action if she failed to do so. If the landlord had taken these steps, it would have been likely that Morton would have gotten rid of the pit bull, particularly because she did not own him. If she refused to get rid of the dog, the landlord could then have instituted legal action. The record in this case, however, shows that the landlord did nothing. In fact, the defendants acknowledge that the landlord "did not take steps to enforce the no pets clause" (defendants' brief in this Court at 22).[3]
It is true that the conduct of the tenant Morton may also have been negligent, that Morton may have breached a duty owed to Matthews and Tevin, and that the landlord may not have affirmatively approved of Morton's harboring the pit bull. Morton's conduct in keeping a vicious animal in her apartment was also a cause of Tevin's death. Nonetheless, as Judge Wilner, writing for the Court of Special Appeals in another context, stated (Bocchini v. Gorn Management Co., 69 Md.App. 1, 12, 515 A.2d 1179, 1185 (1986)), our concern in this case should be
"not so much on whether the landlord has approved the conduct of the tenant as whether he is in a position to correct or terminate it. Where, through lease provisions or otherwise, he has that ability, the thought is that he ought not to be able to escape his obligation under a covenant of quiet enjoyment by steadfastly refusing to exercise his authority.

* * *
"The insertion in a lease of a restriction against excessive noise or other offensive conduct is precisely for the purpose of enabling the landlord to control that conduct." (Emphasis omitted and added).
The tenant Morton was maintaining an extremely dangerous instrumentality, both in the leased premises and at times in the common areas. The landlord knew about the dangerous pit bull dog for a considerable period of time. By the terms of the lease, the landlord had retained a large measure of control over the presence of such an animal *127 in the leased premises. Under the circumstances here, and the prior cases in this Court emphasizing the factor of a landlord's control, it is not unreasonable to impose upon the landlord a duty owed to guests who are either on the leased premises or the common areas.
In addition to the landlord's control and ability to abate the danger of a vicious pit bull in the leased premises, the foreseeability of the harm supports the imposition of a duty on the landlord. This Court, in Jacques v. First National Bank of Maryland, 307 Md. 527, 534-535, 515 A.2d 756, 759-760 (1986), stated that in determining whether a duty exists, the
"two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability." (Emphasis added, footnote omitted).
See also Village of Cross Keys v. U.S. Gypsum, 315 Md. 741, 752-753, 556 A.2d 1126, 1131 (1989). The facts here unequivocally indicate that harm to a tenant's guest by Rampage was entirely foreseeable. Numerous employees of the defendant testified that they knew of the pit bull, were afraid of the pit bull, witnessed attacks by the dog, and were unable to carry out their duties, both in the leased premises and in the common areas, because of the presence of the pit bull.
Thus, the foreseeability of harm in the present case was clear. The extreme dangerousness of this breed, as it has evolved today, is well recognized. "Pit bulls as a breed are known to be extremely aggressive and have been bred as attack animals." Giaculli v. Bright, 584 So.2d 187, 189 (Fla.App. 1991). Indeed, it has been judicially noted that pit bull dogs "bit[e] to kill without signal" (Starkey v. Township of Chester, 628 F.Supp. 196, 197 (E.D.Pa.1986)), are selectively bred to have very powerful jaws, high insensitivity to pain, extreme aggressiveness, a natural tendency to refuse to terminate an attack, and a greater propensity to bite humans than other breeds. The "Pit Bull's massive canine jaws can crush a victim with up to two thousand pounds (2,000) of pressure per square inchโthree times that of a German Shepard or Doberman Pinscher." State v. Peters, 534 So.2d 760, 764 (Fla.App. 1988), review denied, 542 So.2d 1334 (Fla. 1989).[4]See also Hearn v. City of Overland *128 Park, 244 Kan. 638, 650, 647, 772 P.2d 758, 768, 765, cert. denied 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989) ("pit bull dogs represent a unique public health hazard ... [possessing] both the capacity for extraordinarily savage behavior ... [a] capacity for uniquely vicious attacks ... coupled with an unpredictable nature" and that "[o]f the 32 known human deaths in the United States due to dog attacks ... [in the period between July 1983 and April 1989], 23 were caused by attacks by pit bull dogs"). Pit bull dogs have even been considered weapons. See State v. Livingston, 420 N.W.2d 223, 230 (Minn.Ct. App.1988) (for the purpose of first degree assault); People v. Garraway, 187 A.D.2d 761, 589 N.Y.S.2d 942 (1992) (upholding conviction of pit bull's owner of criminal possession of a weapon in the third degree).[5]
The imposition upon the landlord of a duty to abate the dangers presented by a tenant's keeping a vicious pit bull dog on the leased premises is supported by our recent decision in Shields v. Wagman, supra, 350 Md. at 673, 714 A.2d at 884. As mentioned earlier, this Court in Shields held that the landlords of a strip shopping center may be liable for injuries sustained by a patron and a tenant when they were attacked by a pit bull dog named "Trouble," which was owned by another tenant and was kept in that tenant's leased premises. The tenant who owned the pit bull, a man named Thomas, operated an automobile repair shop in the leased premises and kept Trouble in the repair shop. One of the attacks occurred when a customer, Shields, came to the leased premises to drop her car off for repairs, found the door locked even though Thomas's truck was parked outside, peered in the shop's window and saw the pit bull which was jumping and barking, and began to return to her car in the parking lot. Before she could reach the car, the pit bull "burst through the door and attacked Shields, locking onto her calf. Thomas came out of the store and tried to pull Trouble off Shields, eventually succeeding in prying the dog away." 350 Md. at 671, 714 A.2d at 883.
The other attack involved in the Shields case occurred when Bernard Johnson, another tenant of the shopping center, was accompanying one of his customers to pick up the customer's car when he saw the same pit bull coming towards him. "To escape, Johnson jumped on the hood of a van parked in the parking lot. Trouble chased Johnson onto the roof of the van and onto the hood of another car. At that point, Trouble locked onto Johnson's arm. Thomas came over and together Thomas and Johnson beat Trouble until finally Trouble released Johnson's arm, but not before his arm had been torn open." 350 Md. at 671-672, 714 A.2d at 883.
This Court's opening paragraph in the Shields opinion set forth the issue as follows (350 Md. at 668-669, 714 A.2d at 882, emphasis added):

*129 "In the instant case we are called upon to determine whether a landlord of commercial property may be held liable for injuries sustained in the common area and caused by an American Pit Bull Terrier (pit bull) kept on the leased premises by one of the tenants where the landlord had knowledge of the potential danger and the ability to rid the premises of that danger by refusing to re-let the premises. We hold that, under the circumstances of this case, there was a duty by which the landlord may be held liable for the injuries sustained by the Petitioners."
The critical circumstances relied upon by this Court in Shields, namely that a dangerous pit bull was kept on the leased premises by a tenant, that the landlord had knowledge of the potential danger, and that the landlord had the ability to abate the danger by not keeping the dog owner as a tenant, are all present in the case at bar.
While the property involved in Shields was commercial and the property involved in the instant case is residential, the myriad of cases in this Court concerning the duty owed by a landlord of a multi-unit facility for defective or dangerous conditions in either the leased premises or the common areas have accorded no significance to whether commercial or residential property was involved. There is also a difference in that the actual contact between the vicious pit bull and the plaintiffs in Shields occurred in a common area, whereas the contact between Rampage and Tevin occurred in the leased premises. Nevertheless, this difference is also not very significant in light of the circumstances of both cases. Unlike the prior common area cases in this Court, Shields did not involve a defective or dangerous condition in a common area. Instead, the dangerous condition in Shields was precisely the same as in the case at bar: a vicious pit bull dog kept by a tenant in the leased premises. The "control" factor upon which the Court relied in Shields was not the traditional landlord control over common areas. Rather, as in the instant case, it was the landlords' control over the tenant's remaining in the leased premises.
Totally unlike the common area cases in this Court, the failure of the landlords in Shields was not a failure to rectify a dangerous condition in the common area; it was the landlord's retaining the dog owner as a tenant after having knowledge of the dangerous animal kept in the leased premises. The case at bar involves the same situation. Both the injuries in Shields and the injuries and death in the present case arose from the leased premises. The difference between an attack originating from the leased premises, upon a patron of the leased premises, right outside the front door (Shields) and the attack upon Tevin, hardly warrants a different result. There is no principled basis to distinguish the cases.
We do not hold that a landlord's retention in the lease of some control over particular matters in the leased premises is, standing alone, a sufficient basis to impose a duty upon the landlord which is owed to a guest on the premises. This Court has employed a balancing test to determine whether a duty of reasonable care should be imposed in particular circumstances. "[U]ltimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant." Rosenblatt v. Exxon, supra, 335 Md. at 77, 642 A.2d at 189. In the instant case, the various policy considerations that need to be weighed are the general understanding that a tenant is primarily in control of the leased premises and the sanctity of a tenant's home, including her ability generally to do as she sees fit within the privacy thereof, against the public safety concerns of permitting that same tenant to harbor an extremely dangerous animal that will foreseeably endanger individuals inside and outside the walls of the leased premises, the degree of control maintained by the landlord, the landlord's knowledge of the dangerous condition, and the landlord's ability to abate the condition. We, like the majority of courts addressing this issue in other states, believe that the balance should be struck on the side of imposing a duty on the landlord which is owed to guests on the premises.
One of the leading cases in this area is Uccello v. Laudenslayer, 44 Cal.App.3d 504, *130 118 Cal.Rptr. 741 (1975). There, a tenant's dog inflicted serious injury upon a social guest while the guest was in the kitchen of the leased premises. The California court held "that a duty of care arises when the landlord has actual knowledge of the presence of the dangerous animal and when he has the right to remove the animal by retaking possession of the premises." 44 Cal. App.3d at 507, 118 Cal.Rptr. at 743. In assessing a duty of care the Uccello court concentrated on the ability of the landlord to obviate the dangerous condition created by the dog's presence upon the land. The court noted that "permit[ting] a landlord ... to sit idly by in the face of the known danger to others must be deemed to be socially and legally unacceptable." 44 Cal.App.3d at 512, 118 Cal.Rptr. at 746.
The New York courts have also addressed the issue of under what circumstances a landlord owes a duty to a social guest injured by a dangerous animal while on the leased premises. In Strunk v. Zoltanski, 62 N.Y.2d 572, 468 N.E.2d 13, 479 N.Y.S.2d 175 (1984), the court was faced with a "situation in which the landlord, by leasing the premises to the owner of the dog, could be found ... to have created the very risk which was reasonably foreseeable and which operated to injure the plaintiff." 62 N.Y.2d at 575, 468 N.E.2d at 15, 479 N.Y.S.2d at 177. Thus, the court held that the landlord was liable because the landlord had an opportunity to act affirmatively prior to letting the property. The Strunk court stated, however, that "with respect to the liability of a landlord whose tenant comes into possession of the animal after the premises have been leased," in order to "establish liability it must be shown that the landlord had knowledge of the vicious propensities of the dog and had control of the premises or other capability to remove or confine the animal...." 62 N.Y.2d at 575, 468 N.E.2d at 15, 479 N.Y.S.2d at 177. See also Cronin v. Chrosniak, 145 A.D.2d 905, 536 N.Y.S.2d 287 (1988) (The appellate division noted that the defendants admitted in affidavits presented to the court that the landlord knew of the viciousness of the dog and presented no proof that the landlord was unable to remove the dog from the premises. Relying upon Strunk, the appellate court reversed a trial court grant of summary judgment for the landlord and remanded the case for trial).
The Florida courts have on several occasions considered the issue of the landlord's liability in such cases. In Anderson v. Walthal, 468 So.2d 291 (Fla.App.1985), the defendant owned an industrial park which the plaintiff had entered to inquire about leasing a miniwarehouse for storage. The plaintiff was attacked by a pit bull dog owned by one of the defendant's tenants. The court held that if the jury concluded that the agent and manager of the industrial park, to whom the defendant delegated authority for the day-to-day operations of the business, had actual knowledge of the dog and its vicious propensities, the defendant was liable. In addition, see Giaculli v. Bright, supra, 584 So.2d at 189, where the court stated that
"the owner of the premises may be liable for injuries resulting from an attack by a bad dog owned by a tenant if the landlord has actual knowledge of the vicious nature of the tenant's dog or such knowledge can be imputed to the landlord and the landlord has the ability to control the dog's presence."
See also, Vasques By and Through Rocha v. Lopez, 509 So.2d 1241 (Fla.App.1987) (reversing the grant of a directed verdict in favor of the landlord that owned the premises upon which a child was attacked by a pit bull because the jury could infer that the landlord had actual knowledge of the vicious animal and had control over the property).
In Alaskan Village, Inc. v. Smalley, 720 P.2d 945 (Alaska 1986), the court held the owner of a trailer park liable when a tenant's pit bulls mauled the plaintiff within the confines of the property leased to the offending tenant. The court concluded that the defendant had undertaken to control vicious dogs in the trailer park by inserting a provision in the lease prohibiting tenants from keeping vicious dogs. The court's holding of liability was specifically grounded on the defendant's failure to enforce the prohibition in the lease regarding the keeping of vicious dogs on the premises.
*131 The court in Arrington Funeral Home v. Taylor, 474 S.W.2d 299 (Tex.Civ.App.1971), assessed liability upon the operator of a funeral home when the plaintiff was bitten by a dog owned by the defendant's employee who lived, in effect, as a tenant, adjacent to the funeral home. The court held that the defendant could be held liable for the injuries because the defendant had the right to control the use of the premises. The house in which the employee lived, and where the attack occurred, was connected to the funeral home. The house, including all appliances and furniture, was furnished to the employee as part of his salary, and the utilities were paid by the defendant.
In Szkodzinski v. Griffin, 171 Mich.App. 711, 431 N.W.2d 51 (1988), the 6-year-old plaintiff was bitten when a vicious dog owned by the defendant's residential tenant attacked him when he entered the premises to retrieve his ball. The court, citing Strunk v. Zoltanski, supra, 62 N.Y.2d 572, 468 N.E.2d 13, 479 N.Y.S.2d 175, stated that the defendant landlord could be held liable if he knew of the dog's vicious nature.
The federal court in Gallick v. Barto, 828 F.Supp. 1168, 1174-1175 (M.D.Pa.1993), quoting Palermo v. Nails, 334 Pa.Super. 544, 547-548, 483 A.2d 871, 873 (1984), and applying Pennsylvania law, held that " `a landlord... may be held liable for injuries by animals owned and maintained by his tenant when the landlord has knowledge of the presence of the dangerous animal and where he has the right to control or remove the animal by retaking possession of the premises.'"
Other pertinent cases include, e.g., McDonald v. Talbott, 447 S.W.2d 84, 86 (Ky.Ct. App.1969) (in reversing summary judgment entered for the landlord, the court stated that the landlord had knowledge of the dog's viciousness and "that a genuine issue of fact [was] created as to whether the [landlord] took appropriate steps to guard against the... [attack that occurred]"); Lucas v. Kriska, 168 Ill.App.3d 317, 320, 119 Ill.Dec. 74, 522 N.E.2d 736, 737, appeal denied, 122 Ill.2d 577, 125 Ill.Dec. 220, 530 N.E.2d 248 (1988) (stating that, while Illinois law presumes the tameness and docility of dogs, the court "agrees with [Strunk v. Zoltanski, supra, 62 N.Y.2d 572, 468 N.E.2d 13, 479 N.Y.S.2d 175]" that to impose liability on someone other than the owner of the dog, the victim must show that the "defendant property owner had prior knowledge of the dog's viciousness"); McCullough v. Bozarth, 232 Neb. 714, 724-725, 442 N.W.2d 201, 208 (1989) ("We hold that as a general rule, a landlord is liable for injuries caused by the attack of a tenant's dog only where the landlord had actual knowledge of the dangerous propensities of the dog and where the landlord, having that knowledge, nevertheless leased the premises to the dog's owner or, by the terms of the lease, had the power to control the harboring of a dog by the tenant and neglected to exercise that power"); Parker v. Sutton, 72 Ohio App.3d 296, 299, 594 N.E.2d 659, 662 (1991) ("Generally speaking, the landlord will not be responsible when the tenant is in exclusive control of the premises; however, situations where a landlord has an ability to abate the hazard within a reasonable period of time ... may give rise to landlord liability"). See also Annotation, Landlord's Liability to Third Person for Injury Resulting from Attack on Leased Premises by Dangerous or Vicious Animal Kept by Tenant, 87 A.L.R.4th 1004, 1012 (1991) ("The general rule regarding the liability of a landlord to a third person for an attack by a tenant's animal on the leased premises appears to be that the landlord is not liable unless the landlord had knowledge of the animal's presence and its dangerous tendencies, and had control of the premises or otherwise had the ability to eliminate the danger by having the animal removed or confined").
To reiterate, we do not suggest that a landlord is responsible for most negligent conditions in leased apartments including conditions covered by provisions in a lease. Under the present circumstances, however, where a landlord retained control over the matter of animals in the tenant's apartment, coupled with the knowledge of past vicious behavior by the animal, the extremely dangerous nature of pit bull dogs, and the foreseeability of harm to persons and property in the apartment complex, the jury was justified in finding that the landlord had a duty to the *132 plaintiffs and that the duty was breached. The following principle set forth in Prosser and Keeton on The Law of Torts, ง 4 at 25-26 (5th ed.1984), is applicable here:
"The `prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with the compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive."

III.
The plaintiff Matthews argues that the circuit court erred in granting judgment on count III for the defendants after the introduction of all the evidence at the liability phase of the trial. As earlier mentioned, count III asserted a negligence cause of action against the landlords, on behalf of Matthews individually, for damages for the emotional distress suffered by Matthews from the time that the attack began until Tevin's death.[6]
Matthews emphasizes that she was in the immediate zone of danger when the attack upon Tevin began, was impacted by the danger when she was holding Tevin while Rampage was repeatedly biting the child, and was an object of Rampage's aggressive behavior when the dog came around the building to the front door when Matthews was attempting to leave the apartment. Matthews also stresses that the existence of severe emotional distress was clear. She testified at trial that, after the attack and Tevin's death, she could not sleep and eat for two weeks, she would not drink fluids and became dehydrated, she had nightmares on the rare occasions when she actually fell asleep, she "would wake up yelling and screamingโ screaming out real loud," she did not want to talk to anyone and wanted to be alone, and she "felt like killing myself." Other witnesses testified about her emotional distress, including Tevin's father, Andre Williams, who stated that "she'd [Matthews] just start crying," and that on one occasion "she just started talking about [Tevin] ..., and then all of a sudden she ... grabbed me and just started screaming out."
Moreover, at the liability phase of the trial, during a discussion of Matthews's request for damages for the emotional distress suffered during the attack, the defendants' counsel stipulated as follows:
"DEFENSE COUNSEL: ... I'm not going to require the Plaintiff to prove in the liability trial severe emotional distress. I don't know what the extent of the emotional distress that she suffered. There's no doubt that she did.
"THE COURT: I think what the Plaintiff is saying is he wants to make sure that it is not raised [that] he has not met his burden of showing severe emotional distress.
"DEFENSE COUNSEL: That would not be raised.
"THE COURT: And I understand that the extent, of course, does affect the damages, but I don't think anybodyโanybody would say that any parent, mother or father, watching their child torn apart by a dog of any type doesn't suffer severe emotional distressโso I don't think that should be a burden for purposes of liability. No one's beginning to say it will be announced to the jury that you stipulated that she suffered severe emotional distress.
"DEFENSE COUNSEL: I have no problem with that.
"THE COURT: So it won't be announced to the jury, but I think reasonable people would agree, the extent and the testimony, therefore, will come out in the damages phase."
Under settled Maryland tort law, from Green v. Shoemaker, 111 Md. 69, 77-83, 73 A. 688, 691-693 (1909), through Belcher v. T. Rowe Price, 329 Md. 709, 722-736, 621 A.2d 872, 878-885 (1993), in negligence *133 "actions, damages may be recovered for emotional distress capable of objective determination. In other words, under Vance`s [Vance v. Vance, 286 Md. 490, 408 A.2d 728 (1979) ] definition of `physical injury,' damages resulting from harm psychological in nature may be obtained, independent of physiological harm, provided the cause and effect of psychological harm are established." Belcher v. T. Rowe Price, supra, 329 Md. at 734, 621 A.2d at 884.
Earlier, in Bowman v. Williams, 164 Md. 397, 404, 165 A. 182, 184 (1933), the Court stated:
"In Maryland the decision[s] ... have settled the principle that a plaintiff can sustain an action for damages for nervous shock or injury caused, without physical impact, by fright arising directly from defendant's negligent act or omission, and resulting in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state." (Emphasis added).
As pointed out in Green v. Shoemaker, supra, 111 Md. at 77, 73 A. at 691, the limitations upon a tort recovery for "mere fright" is
"because mere fright is easily simulated, and because there is no practical standard for measuring the suffering occasioned thereby, or of testing the truth of the claims of the person as to the results of the fright."
When it is clear that the emotional distress existed and was caused by the defendant's negligence, however, the result is otherwise. The Court in Green v. Shoemaker, supra, 111 Md. at 79, 73 A. at 691, continued:
"Here is a young woman, thirty years of age, in sound health and free from any nervous disorder or tendency. She is subjected to a long continued series of terrific blastings near her dwelling, shattering the roof, walls, and windows, by day and by night, and in the language of the declaration `putting her in continual fear and jeopardy of her life.' In the absence of any evidence of any other cause, why then may not her nervous prostration be traced by the jury ... ?"
See, e.g., Belcher v. T. Rowe Price, supra, 329 Md. at 735, 621 A.2d at 885 (when "the mental distress appears to be real and serious, there is no good reason to deny recovery"); Vance v. Vance, 286 Md. 490, 496-501, 408 A.2d 728, 731-734 (1979).
In Faya v. Almaraz, 329 Md. 435, 456-459, 620 A.2d 327, 337-339 (1993), Chief Judge Murphy for the Court, in the course of reviewing the prior Maryland cases on the subject, summarized as follows:
"[W]e note that it was formerly the rule that there could be no recovery of tort damages for mere fright or mental suffering caused by negligence unconnected with physical impact or injury.... Our subsequent cases have departed from this rigid rule.

* * * * *
"In Vance v. Vance, 286 Md. 490, 408 A.2d 728 (1979), we held that damages could be recovered for emotional distress resulting from a tortious act; that a `physical injury' could be proved by evidence indicative of a mental state; and that the term `physical' in this context is not to be afforded its usual dictionary meaning, but rather as an injury `capable of objective determination.' Id. at 500, 408 A.2d 728 [at 734]. The injuries alleged in Vance were mental distress, nervousness, sleeplessness, spontaneous crying, and depression; there was no medical diagnosis of any physical ailments. In finding Mrs. Vance's injuries to be legally cognizable, we said that the requirement of `physical injury' for recovery in negligence meant only that the alleged injuries must be objectively measurable.

* * *
"In the instant case, appellants allege that their fear and mental and emotional distress are accompanied by headache, sleeplessness, and the physical and financial sting of blood tests for the AIDS virus. Vance and its precursors dictate that appellants *134 may recover for these injuries, to the extent that they can objectively demonstrate their existence."
Under the above decisions, the circuit court in the present case erred in granting judgment for the defendants on count III on the ground that Matthews suffered "no physical injuries." In light of the evidence, and particularly the defendants' stipulation, Matthews obviously suffered real and severe emotional distress during the attack upon Tevin and prior to his death. She was entitled to recover damages for such emotional distress.
The plaintiff Matthews argues that a new trial on count III is not required because the identical damages were sought under both count III and count IV, that the jury under count IV determined that the damages to compensate Matthews for her emotional distress prior to Tevin's death was $1,110,000, that this would have been the amount for the emotional distress prior to Tevin's death if the jury had rendered its award under count III, and that under the statutory cap in effect at the time on noneconomic damages, Code (1974, 1989 Repl.Vol.), ง 11-108 of the Courts and Judicial Proceedings Article, the jury's award of $1,110,000, for emotional distress should be reduced to $350,000, and judgment for this amount should be entered.
The defendants, on the other hand, argue that a new trial on count III "would be necessary, however, since the elements of the tort of intentional infliction of emotional distress suggest compensation as a result of outrageous conduct." (Defendant's brief in this Court at 38).
In our view, the plaintiff Matthews has the better argument. As was made clear in the trial court, the damages sought under both count III and count IV were, in the words of the trial judge, "the same," for the emotional distress "as a direct and proximate result of seeing her son attacked and mauled." In both counts the damages sought were for Matthews's emotional distress prior to Tevin's death. Under both counts, compensatory damages only were sought. Matthews did not seek punitive damages. Although the elements of the tort of intentional infliction of emotional distress and the tort of negligence are obviously quite different, the law concerning the recovery of emotional distress compensatory damages as a result of the tortious conduct is the same. Compare Vance v. Vance, supra, (intentional infliction of emotional distress) with Bowman v. Williams, supra, (negligence). Therefore, judgment should be entered for the plaintiff Matthews on count III in the amount of $350,000.

IV.
The trial judge in this case instructed the jury that whether the defendants acted reasonably depends, inter alia, upon "the circumstances and the danger that is known or should be known. Therefore, if the foreseeable danger increases, a reasonable person acts more carefully." The trial judge also instructed the jury that any negligence or breach of duty which it might find on the part of the defendants need not be the only cause of the injury but that a "defendant's negligence must be a direct and substantial factor in bringing about the injury."
At the conclusion of the trial judge's instructions, the defendants did not object to the above-mentioned instructions concerning foreseeability and proximate cause. Nevertheless, the defendants did except to the trial judge's failure to give their proposed instruction number 9, which was as follows:
"PROXIMATE CAUSE
"Although an injury might not have occurred `but for' an act of the defendant, liability may not be imposed if the negligence of the landlord is merely passive and potential, while the negligence of the tenant or the plaintiff Shanita Matthews is the moving and effective cause of the injury."
The trial judge declined to give this instruction because she believed it to be a misleading statement of the law as applied to the circumstances of the present case and because she believed that the matter was properly covered by the instructions which she had given to the jury.
Labeling its proposed instruction number 9 as an instruction "on the intervening, superseding cause issue" (defendants' brief in *135 this Court at 34), the defendants in the Court of Special Appeals and in this Court argued that the "trial court erred in refusing to permit the jury to consider potential intervening, superseding causes of the injuries in this case." (Defendants' brief in the Court of Special Appeals at 21). The Court of Special Appeals, in dicta, agreed with the defendants' argument.
The defendants' proposed instruction number 9 was taken from the text of the opinion in Bloom v. Good Humor Ice Cream Co., 179 Md. 384, 387, 18 A.2d 592, 593-594 (1941). In Bloom, the plaintiff had purchased some ice cream from the defendant's parked ice cream truck, and was thereafter crossing the street to his home when he was struck by an automobile. At one point in the Bloom opinion, Judge William Forsythe for the Court stated that "where the negligence of any one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability." 179 Md. at 387, 18 A.2d at 593-594. Later in the opinion the Court held that the acts by the plaintiff and by the third person driving an automobile, all occurring subsequently to the defendant's alleged negligence, were intervening, superseding causes of the plaintiff's injuries. 179 Md. at 388-389, 18 A.2d at 594.
While the decision in Bloom was ultimately based on a holding of intervening, superseding cause, the earlier quoted language about "merely passive" negligence certainly does not constitute a good general jury instruction on intervening, superseding cause. Subsequent opinions of this Court have limited the "passive" negligence language of Bloom, and indeed have limited the holding in that case, to the type of factual situation there involved. See, e.g., Yellow Cab Co. v. Hicks, 224 Md. 563, 568, 168 A.2d 501, 503 (1961); Jubb v. Ford, 221 Md. 507, 514, 157 A.2d 422, 425-426 (1960); Texas Company v. Pecora, 208 Md. 281, 291-292, 118 A.2d 377, 381 (1955). See also Caroline v. Reicher, 269 Md. 125, 131-134, 304 A.2d 831, 834-836 (1973); Farley v. Yerman, supra, 231 Md. at 449, 190 A.2d at 775.
The observation of Judge J. Dudley Digges for the Court in State v. Grady, 276 Md. 178, 186, 345 A.2d 436, 440 (1975), is applicable here. Referring to "misleading" language in a jury instruction taken from the discussion in a prior opinion of this Court, Judge Digges stated: "Again we suggest that it is not always appropriate to quote from appellate decisions in jury instructions...." See also Flohr v. Coleman, 245 Md. 254, 262, 225 A.2d 868, 872 (1967) ("The reasoning of courts in opinions is not addressed to juries and is not always adapt[able] to use in instructions to them"); Garfinkle v. Birnios, 232 Md. 402, 404, 194 A.2d 91, 93 (1963) ("we do not approve the reading of excerpts from our prior opinions").
The language from the opinion in Bloom v. Good Humor Ice Cream Co., supra, embodied in the defendants' proposed instruction number 9, is not a good general superseding cause instruction because of the difficulty with the "passive" negligence concept. In addition, as discussed below, the proposed instruction contained no reference to the critical concept of foreseeability. To the extent that parts of the proposed instruction 9 might have any applicability in this context, the trial judge's instructions concerning foreseeability and proximate cause, and particularly telling the jury that any negligence of the defendants "must be a direct and substantial factor in bringing about the injury," covered the matter better than proposed instruction number 9. See Montgomery County v. Wade, 345 Md. 1, 20, 690 A.2d 990, 999 (1997) (the trial court "need not grant any requested instruction if the matter is fairly covered by instructions actually given").
Furthermore, as indicated above, the defendants' proposed instruction 9 and their intervening, superseding cause argument overlook entirely the matter of foreseeability. As we recently reiterated in B G & E v. Lane, 338 Md. 34, 52, 656 A.2d 307, 316 (1995), "[e]ssentially, the intervening negligence is not a superseding cause if it is reasonably foreseeable."
The explanation of a superseding cause set forth by the Court in State v. Hecht Company, 165 Md. 415, 422, 169 A. 311, 313 (1933), has been quoted repeatedly by this Court:
"If the negligent acts of two or more persons, all being culpable and responsible *136 in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another."
See, e.g., B G & E v. Lane, supra, 338 Md. at 52, 656 A.2d at 315; Hartford Ins. Co. v. Manor Inn, 335 Md. 135, 160, 642 A.2d 219, 231 (1994); Atlantic Mutual v. Kenney, 323 Md. 116, 131, 591 A.2d 507, 514 (1991).
In the case at bar, the evidence clearly showed, and the jury found, that the injuries caused by Rampage were foreseeable by the defendants. Thus, the negligence of the tenant Morton, and any possible negligence on the part of Matthews, were simply concurrent causes of the injuries and death of Tevin. They were not superseding causes.
Moreover, the negligence of a tenant or dog owner in continuing to keep a vicious animal on the premises was present in the numerous cases discussed in Part II of this opinion, including the Shields case, but none of those cases held that such actions relieved the landlords of liability.
As to Matthews, as discussed in Part V below, the defendants virtually conceded in the trial court that she was not negligent. In addition, Code (1974, 1995 Repl.Vol.), ง 10-910 of the Courts and Judicial Proceedings Article states:
"In an action on behalf of an infant to recover for death, personal injury, or property damage the negligence of the parent or custodian of the infant may not be imputed to the infant."
In light of that statute, a parent's negligence will be deemed to constitute an "independent and superseding cause of the child's injuries" in only an "extraordinary situation." Caroline v. Reicher, supra, 269 Md. at 130, 304 A.2d at 834. In Caroline v. Reicher, a landlord's alleged negligence allowed lead paint to remain in an apartment, and the infant plaintiff, a child of the tenant, suffered permanent injuries as a result of ingesting lead paint. The landlord argued that the mother's negligence in permitting the child to ingest the lead paint was a "superseding cause so as to relieve the landlord of liability." 269 Md. at 130, 304 A.2d at 834. This Court flatly rejected the argument, saying (269 Md. at 131, 304 A.2d at 834):
"Under the evidence here, as a matter of law, we do not think that the actions of the mother were such as to be a superseding negligent cause. And, we will not permit this attempted end run around the provisions of [ง 10-910] to succeed."
See Katz v. Holsinger, 264 Md. 307, 312-315, 286 A.2d 115, 118-119 (1972) (tenant's child injured because of a dangerous condition in the leased premises, and the Court held, as a matter of law, that the tenant's negligence was not a superseding cause relieving the landlord from liability); Farley v. Yerman, supra, 231 Md. at 449, 190 A.2d at 775 (the Court held, as a matter of law, that "any negligence of the parents was not a superseding cause of the harm which the landlord's negligent conduct was a substantial factor in bringing about"). See also Richwind v. Brunson, supra, 335 Md. at 681 n. 8, 645 A.2d at 1156 n. 8, citing ง 10-910 and citing Caroline v. Reicher, supra.
For all of the above-discussed reasons, the trial judge did not err in refusing to give the defendants' proposed instruction number 9.

V.
As discussed in the beginning of this opinion, more than a year after their answer was filed, and a few days before the scheduled trial date, the defendants filed an amended answer adding the affirmative defenses of contributory negligence and assumption of the risk. The trial court, after a hearing, refused to allow these additions on the eve of trial. In their appeal to the Court of Special Appeals, the defendants argued that the circuit court's ruling in this regard *137 constituted an abuse of discretion. Because of its holding that the defendants did not breach a duty owed to Tevin or Matthews, the Court of Special Appeals did not need to, and did not, reach this issue concerning allegations of negligence and assumption of the risk.
The plaintiffs' petition for a writ of certiorari did not set forth this issue among the "questions presented," although the petition contained a limited discussion of whether there was any evidence of negligence on the part of Matthews (petition for a writ of certiorari at 13-14). The defendants in their cross-petition for a writ of certiorari did present the issue of whether the circuit court abused its discretion in not allowing the amendment insofar as it added the allegation of contributory negligence. Nevertheless, this Court denied the cross-petition. The defendants have, however, argued in their brief in this Court that "[t]he trial court erred ... in refusing to instruct the jury on the issue of contributory negligence." (Defendants' brief in this Court at 35).
Maryland Rule 8-131(b) provides that, in a case decided by an intermediate appellate court, "the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition...." (Emphasis added). Of course, as pointed out above, the abuse of discretion issue was raised in a cross-petition but that petition was denied.
Normally, under circumstances like these, our practice has been not to decide the issue but to remand the case to the Court of Special Appeals for that court to decide the matter. Nevertheless, on occasions, where under these circumstances the issue "can be disposed of quickly," we have, in the interests of judicial economy and expedition, deemed it appropriate to decide such an issue rather than remand the matter to the Court of Special Appeals for decision. Bowden v. Caldor, 350 Md. 4, 18-19 n. 6, 710 A.2d 267, 274 n. 6 (1998). This is one of those occasions in which the issue can be disposed of quickly and easily. There is no good reason to prolong appellate proceedings in this case.
As an initial matter, we point out that the issue, of whether the defendants should have been allowed belatedly to assert contributory negligence and assumption of the risk, can only relate to count III. The circuit court's judgment on count IV was in favor of the defendants, and the plaintiffs have not challenged that on appeal. With regard to counts I and II, Tevin, as a sixteen-month old baby, as a matter of law could not have been guilty of contributory negligence or assumption of the risk. See Miller v. Graff, 196 Md. 609, 620, 78 A.2d 220, 224 (1951) ("a child four years old cannot be guilty of contributory negligence under any circumstances"); Bozman v. State, 177 Md. 151, 155, 9 A.2d 60, 62 (1939); Mahan v. State, 172 Md. 373, 385-386, 191 A. 575, 581 (1937) ("The great weight of authority is opposed to the proposition that a child a little over four years of age can be guilty of contributory negligence"). Of course, in light of ง 10-910 of the Courts and Judicial Proceedings Article, discussed in Part IV above, any possible negligence of Matthews could not be imputed to Tevin.
At the hearing in the trial court as to whether the defendants should have been allowed to assert the defenses of contributory negligence and assumption of the risk on the eve of trial, the trial judge asked defense counsel why he wanted to amend the answer so late, and defense counsel stated that it was because of "new information" that had just come to his attention. According to defense counsel, the plaintiffs' attorney had told him a few days before that there was evidence that "all of the neighbors knew that this dog was vicious." Defense counsel stated that if the plaintiffs were going to introduce such evidence, and if the people living in the neighborhood knew about the viciousness of the dog, then it would follow that the plaintiff Matthews "knew or should have known of the vicious propensities of this dog" and that the knowledge would constitute "contributory negligence and assumption of risk."
Defense counsel further explained that it was his position that, "as of February the 8th of 1994, no one knew that this dog was vicious including the plaintiff," that based on the facts known to him and evidence adduced during discovery, "there can't be any" contributory negligence, but that if the plaintiffs' *138 attorney intended to prove at trial that people in the neighborhood knew that the dog was vicious, then there would be an issue of contributory negligence. The plaintiffs' attorney responded that he was not going to introduce the type of evidence which concerned the defendants' attorney.
The trial judge then ruled that she would strike the portion of the amended answer asserting contributory negligence and assumption of the risk, but that if the plaintiffs should present
"testimony that everybody knew or the community knew that the dog was vicious, giving rise then to your argument of an inference that if the community knew the plaintiff should have known, I will consider permitting you at that time, before it goes to the jury, to amend the answer to add that, all right?"
Defense counsel responded:
"Yes, Your Honor."
At the conclusion of the trial, the trial judge pointed out to the defendants' counsel that the plaintiffs had not introduced the type of evidence which had precipitated the belated request to amend the answer. The defendants' attorney did not disagree with the trial judge in this regard.
In light of the facts set forth above, the trial judge obviously did not abuse her discretion in refusing to allow the late amendment to the answer.
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY WITH REGARD TO COUNTS I, II, AND IV, AND TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT WITH REGARD TO COUNT III, AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR THE ENTRY OF JUDGMENT ON COUNT III AS PROVIDED FOR IN THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE DEFENDANTS-RESPONDENTS.
RODOWSKY, CHASANOW and CATHELL, JJ., dissent.
RODOWSKY, Judge, dissenting.
I respectfully dissent based on the substance of the reasons presented in the dissenting opinion by Judge Chasanow.
CHASANOW, Judge, dissenting in which CATHELL, Judge, joins.
Tragic cases may have tragic consequences when sympathy for a plaintiff interferes with a court's ability to analyze the facts and apply the law. Sympathy for the victim of a tragedy should not serve as a substitute for evidence of duty, culpability, and proximate cause. The legal issue in this case is whether a landlord should have to pay over five million dollars solely because the landlord did not make a futile attempt to evict a tenant whose dog barked and growled at maintenance men trying to enter the dog's residence when its owner was not home.
Ms. Matthews suffered a grievous loss as a result of her son playing with a pit bull in a friend's apartment where she and her son were weekly social guests. The effect of affirming this five million dollar judgment in favor of Ms. Matthews may ultimately have severe repercussions for lessees with dogs. Landlords wishing to avoid multimillion dollar lawsuits may be forced to initiate eviction proceedings to terminate leases whenever a tenant's dog acts aggressively toward maintenance personnel who attempt to enter the tenant's dwelling when the tenants are not home, and I doubt very many dogs would not bark and growl at a stranger trying to enter a dwelling when the dog's owner is absent. The case will certainly have tragic consequences for pit bulls because the majority opinion, in effect, makes ownership of a pit bull per se negligence, and the Court seems to advocate that the entire breed should be eradicated. Perhaps the worst tragedy is the implication that rich landlords and sympathetic victims are judged by totally different standards. Ms. Matthews knew this pit bull and its temperament far, far better than *139 the landlord; yet, under the majority's ruling, the landlord was negligent for not safeguarding Ms. Matthews' son from the dog, and Ms. Matthews was neither contributorily negligent for not safeguarding her son nor an intervening superseding cause for allowing her son to play with the dog. On that same issue, the majority discusses at great length the widespread general knowledge that pit bulls are extremely dangerous, but apparently only the landlord, not Ms. Matthews, could be chargeable with that knowledge since her contributory negligence is held not to be an issue to be submitted to the jury. Under the majority's reasoning, the young child's injury by the dog was foreseeable by the landlord, but not by his mother. The landlord was a cause of the child's injuries because it did not make a futile attempt to evict the dog's caretaker, but Ms. Matthews could not be found to be an intervening superseding cause even though she brought her young child to the dog's home and permitted the infant's unsupervised play with the dog. It does not seem as if the rules of the law of negligence are being applied equally.

ADDITIONAL FACTS
In holding that there was insufficient evidence to permit a jury to find Ms. Matthews was contributorily negligent or that her actions were an intervening superseding cause, the majority may be losing sight of its obligation to look at the facts in the light most favorable to the landlord. These facts indicate Ms. Matthews had far, far greater knowledge of Rampage and his temperament than the landlord, and if the landlord could be found negligent for not evicting the dog, how could Ms. Matthews not also be negligent for letting her infant son play throughout this two-bedroom apartment with this dog? On the issue of superseding cause, it seems a reasonable conclusion that 16month-old Tevin did something to enrage Rampage. On this occasion, while Ms. Matthews was working on a puzzle, the two children were playing in Darnelle's room, the hallway, and the living room along with the dog. It is reasonable to assume Tevin unwittingly did something that injured or tormented Rampage. Rampage's hostility was only directed at young Tevin, and even after the dog was repeatedly stabbed, it continued to attack Tevin. Keeping in mind that this was the first time Rampage had bitten anyone, if the landlord was a cause of the injuries for not evicting the tenant, could not a reasonable jury find that Ms. Matthews was a superseding cause for letting a 16-month-old child play throughout the apartment with the dog?
Ms. Matthews knew Rampage better than anyone except the dog's owner. She and her child had visited with the dog on dozens and dozens of occasions, at least weekly, for the entire time her friend was caring for the dog. Even if the landlord's negligence was an issue for the jury, the jury also should have been permitted to consider whether Ms. Matthews' own conduct in failing to safeguard her infant son from the dog, which is what she claims the landlord did, as well as that her conduct in permitting this 16-month-old child's unsupervised play throughout a two bedroom apartment with and around the dog could be an intervening, superseding cause or contributory negligence as to her cause of action.
The majority seems to place great emphasis on the assumption that Rampage is a pit bull. This too is inaccurate. Plaintiff's interrogatory "Answer No. 14" filed in the "Joint Record Extract" identifies Rampage's breed as "Staffordshire bull terrier." In addition, a "Plaintiff's Trial Brief" is part of the record, and it identifies Rampage as a Staffordshire bull dog. The American Pit Bull Terrier has been a separately recognized breed since the early 1970's, as has the Staffordshire bull terrier, although the two did have a common ancestry. JACQUELINE O'NEIL, THE ULTIMATE AMERICAN PIT BULL TERRIER, at 21 (1995). If the majority is going to make ownership of pit bulls evidence of negligence, it should define its terms. Perhaps the reason why Rampage is sometimes referred to in the briefs and by the majority as a pit bull is that "[i]n recent years, the media have misused the term Pit Bull, calling practically every dog that gets into trouble by that nameโincluding all manner of mongrels and mixed-bred dogs." JACQUELINE O'NEIL, THE ULTIMATE AMERICAN PIT BULL TERRIER, at vi (1995).
*140 The majority makes an appellate fact finding that Rampage is "highly dangerous" and was "an extremely dangerous instrumentality," 351 Md. at 554, 560, 719 A.2d at 119, 126 (1998), and these assumptions seem to be an important part of its rationale. This is improper appellate fact finding, improper not only procedurally, but substantively. Ms. Matthews knew Rampage much better than anyone who testified in the case. She visited the dog not less than once a week for over a year, and she did not see any evidence that Rampage was dangerous to people. She testified she would have heard if Rampage bit anyone, and she had never heard of him injuring anyone. There was other evidence that there were no reports to the Bureau of Animal Control that Rampage had attacked anyone. The primary evidence of Rampage's aggressiveness was his behavior when maintenance people tried to enter the apartment when no one was home. What dog would not behave aggressively toward a stranger trying to invade its home? Rampage's behavior while chained outside the apartment was generally placid unless he perceived someone's approach as a danger. A maintenance supervisor, William Wenger, called by the plaintiff, testified that he would have heard if Rampage had attacked any maintenance personnel and to his knowledge the dog never attacked anyone. Another of the plaintiff's witnesses, David Jones, described Rampage's behavior while chained outside of the apartment as follows: "Not vicious. I mean, most of the time he was just laying there. He might have been walking to and fro, but not like an attack dog. Just like a normal dog would act." Both the landlord and Ms. Matthews may have had some reason to be cautious around Rampage, but he was not known to be "highly dangerous." If the assumption that Rampage was extremely dangerous or highly dangerous is as significant to the majority's decision as it appears to be, this is a factual finding for the jury, not for an appellate court, and the jury certainly did not find Rampage was "highly dangerous" or "extremely dangerous."

SOCIAL GUESTS
At the time of Tevin's tragic accident, Ms. Matthews and Tevin were social guests. The duty owed to a social guest is explained by this Court in Paquin v. McGinnis, 246 Md. 569, 229 A.2d 86 (1967). Judge Marbury wrote:
"A social guest who enters a premises at the express or implied invitation of the host is not an invitee in a legal sense even though he enters the premises upon the basis of the invitation. A social guest enters the premises of his host for his own benefit and convenience, and the hospitality the guest receives is bestowed gratuitously. The use of the premises is extended to him merely as a personal favor to him. As a sign of hospitality the host often treats the guest as `one of the family' to whom is offered the first serving or the most comfortable chair. The legal duty owed to a social guest by a host is to take the same care of the guest that the host takes of himself and other members of his family."
Paquin, 246 Md. at 572, 229 A.2d at 88.
He further quoted from the RESTATEMENT (SECOND) OF TORTS ง 342, which the Court adopted.
"The Restatement (Second), Torts, Section 342, imposes liability upon a host for physical harm caused to guests by a condition on the premises if, but only if, (1) the host knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such guests, and should expect that they will not discover or realize the danger, and (2) the host fails to exercise reasonable care to make the condition safe, or to warn the guests of the condition and the risk involved, and (3) the guests do not know or have reason to know of the condition and the risk involved."
Paquin, 246 Md. at 572, 229 A.2d at 88.
Emphasizing the very limited duty, even to warn of dangers or defects, Judge Marbury pointed out that there is not even that duty where the host had no knowledge or means of knowledge of the danger or defect. Furthermore, if the condition "should be obvious" to the guest, the host need not warn him. Id. Ms. Matthews had more knowledge of this dog and its temperament than *141 the landlord, and the landlord owed her no duty to warn her about the dog. Surely the majority is not suggesting that, when a tenant's social guest is invited inside of the leased dwelling, the landlord owes the social guest a greater duty than the tenant who extended the invitation. It would be unreasonable for many reasons to hold that the landlord owes a higher duty than the tenant to the tenant's social guests while they are in the leased residence. One primary reason is that the landlord could not seek indemnification from the tenant who created and controlled the dangerous condition in the leased dwelling, if the tenant does not owe the same duty to the injured social guest as the landlord. Perhaps the majority has the landlord's duty toward someone within the common areas confused with the landlord's duty to someone within the leased portion of the premises. The higher duty the landlord owes to all people in the common areas is based on the landlord's exclusive control over and exclusive duty to maintain the common areas, as well as the relationship between the common areas and the landlord's business of leasing the individual units. When a tenant and the tenant's guests are in the common areas, they are in effect business invitees of the landlord, but when the tenant and the tenant's guests go into an apartment rented by the tenant, they are no longer in an area maintained or controlled by the landlord.
"When different parts of a building, such as an office building or an apartment house, are leased to several tenants, the approaches and common passageways normally do not pass to the tenant, but remain in the possession and control of the landlord. The tenants are permitted to make use of them but do not occupy them, and the responsibility for their condition remains upon the lessor. His position is closely analogous to that of a possessor who permits visitors to enter for a purpose of his own; and those who come in the course of the expected use may be considered his invitees, as a good many courts have held. He is therefore under an affirmative obligation to exercise reasonable care to inspect and repair such parts of the premises for the protection of the lessee; tenant's family, his employees, his invitees, his guests, and others on the land in the right of the tenant, since their presence is a part of the normal use of the premises for which the lessor holds them open.

* * *
It may even extend into the portion of the premises leased to the tenant, provided that the landlord has retained control over that aspect of the premises responsible for the injury." (Footnotes omitted).
PROSSER AND KEETON ON LAW OF TORTS ง 63, at 440, 442 (W. Page Keeton et al. eds., 5th ed.1984).
Maryland law imposes no higher duty on the landlord than is imposed on the tenant to safeguard social guests of the tenant within the tenant's residence. Sherwood Brothers, Inc. v. Eckard, 204 Md. 485, 493, 105 A.2d 207, 209 (1954) is directly on point. In that case, a filling station was leased and both the landlord and tenant knew that a car lift in a greasing room not open to the general public was in an unsafe condition. Plaintiff, who was feeling ill, was invited into the greasing room by the tenant while the tenant was greasing a car. Plaintiff was injured when an automobile rolled off the unsafe lift. Plaintiff sued and recovered a judgment against the landlord, and this Court reversed the judgment. We held that plaintiff was an invitee of the tenant into the non-public area, so the plaintiff was, in effect, a bare licensee, and therefore, the landlord was only liable for defects the landlord knew about and did not inform the tenant about. We said:
"The condition of the lift at the time of the lease, and thereafter, was as fully known to the tenant as it was to the landlord, and this being so, under the general rule, the landlord owed the tenant no duty in respect of it, and as a consequence, owed no duty to an invitee of the tenant." (Emphasis added).
Sherwood Brothers, 204 Md. at 492, 105 A.2d at 210. We did note that, had plaintiff's injuries been sustained in a portion of the premises that the landlord knew would be open to the general public, the result may have been different, but because plaintiff was injured in a portion of the premises not open *142 to the public, even though he was an invitee of the tenant and even though the landlord knew of the dangerous condition, the landlord was not liable. That holding is directly on point and should control the disposition in the instant case.
The majority's holding seems to be that a pit bull like Rampage constitutes a dangerous nuisance and the landlord had a duty to abate the nuisance by evicting the tenant for violation of the "no pets" clause. That is contrary to hundreds of years of Maryland law. Judge Sonner, writing for the Court of Special Appeals, succinctly summed up the law on landlord's liability in Maryland. He wrote:
"In Maryland, the settled law is that when the owner has parted control of the premises, the tenant has the burden of keeping the premises properly, in the absence of an agreement to the contrary. Marshall v. Price, 162 Md. 687, 689, 161 A. 172[, 172] (1932)(emphasis supplied). The landlord is not responsible for any nuisance created by the tenants. Id. In Marshall v. Price, the tenant had dug a pit on land that was leased to him. A guest visiting the tenant fell into the pit, injured herself, and sued the landlord. The Court stated `[i]t does not follow that because the defendants are the owners of the lot that they are liable for all the nuisances that may be created thereon, no matter by whom.' Id. at 689, 161 A. 172 [quoting Maenner v. Carroll, 46 Md. 193, 215 (1877) ]."
Amberwood v. Matthews, 115 Md.App. 510, 519-20, 694 A.2d 131, 136 (1997).
In State v. Feldstein, 207 Md. 20, 113 A.2d 100 (1955), the Court held that the landlord was not liable for the death of his tenant's family by asphyxiation due to the tenant's faulty installation of a gas heater. It held:
"`If a landlord demise[s] premises which are not in themselves a nuisance, but may or may not become such, according to the manner in which they are used by the tenant, the landlord will not be liable for a nuisance created on the premises by the tenant. He is not responsible for enabling the tenant to commit a nuisance, if the latter should think it proper to do so.'" Feldstein, 207 Md. at 34, 113 A.2d at 106 (quoting Maenner, 46 Md. at 216). See also Petrushansky v. State, 182 Md. 164, 173-74, 32 A.2d 696, 700 (1943)(quoting the same language from Maenner, supra); Miller v. Fisher, 111 Md. 91, 93, 73 A. 891, 892 (1909)(A tenant in possession must keep the premises in proper condition, and he, not the landlord, is responsible for injury from a nuisance on the land, unless resulting from defective construction of the premises when they were leased.).

CASES FROM OTHER JURISDICTIONS
Many of the courts in other jurisdictions have noted that a landlord may be held liable for injuries caused by a tenant's animal, which the landlord knew was vicious and was maintained on the premises, where the injuries occurred on publicly open portions or common areas of the leased premises. See, e.g., Bailey v. DeSanti, 36 Conn.Supp. 156, 414 A.2d 1187, 1188 (1980); Lidster v. Jones, 176 Ga.App. 392, 336 S.E.2d 287, 288 (1985), cert. dismissed sub nom. Pine Terrace Associates, Ltd. v. Lidster, 255 Ga. 405, 341 S.E.2d 8 (1986); McDonald v. Talbott, 447 S.W.2d 84, 85-86 (Ky.Ct.App.1969); Siegel v. 1536-46 St. John's Place Corporation, 184 Misc. 1053, 57 N.Y.S.2d 473, 474 (N.Y.City Ct.1945); Baker v. Pennoak Properties, Ltd., 874 S.W.2d 274, 277 (Tex.Ct.App.1994); see also Castillo v. Santa Fe County, 107 N.M. 204, 755 P.2d 48, 51 (1988)("As landlord, [the operator of county-owned public housing] was under a duty to maintain safely those areas expressly reserved for the use in common of the different tenants.").
These courts generally emphasize the control that the landlord retains over common areas. For example, in Linebaugh v. Hyndman, 213 N.J.Super. 117, 516 A.2d 638 (App. Div.1986), aff'd, 106 N.J. 556, 524 A.2d 1255 (1987), the plaintiff sued the landlord for injuries her daughter sustained when she was attacked by a dog owned by one tenant while another tenant was babysitting the plaintiff's daughter. 516 A.2d at 639. Significantly, the attack occurred in a common backyard reserved for the use of the two tenants who lived in separate units in a two-family house. Id. There was evidence that the nonresident, defendant-landlords were *143 aware of the dog and its vicious propensities. Id. Reversing summary judgment which had been granted in favor of the landlord, the Superior Court of New Jersey emphasized that "[w]here a dwelling contains two or more apartments which are rented to separate tenants and the landlord provides certain facilities for their common use or benefit, possession and control of such portions are deemed to be retained by him," and thus, a duty is imposed on the landlord to exercise reasonable care in maintaining these common areas. Linebaugh, 516 A.2d at 640. The court held that a landlord's obligation "to exercise reasonable care in the maintenance of common facilities under his control" encompasses a duty owed to the invitees of the landlord's tenants to prevent injury from a vicious animal kept on the premises. Id.
In a similar case, Baker, supra, the Court of Appeals of Texas noted that "a lessor retaining control over premises used in common by different occupants of his property has a duty to exercise reasonable care to keep those common areas reasonably safe for the use of tenants and their guests." 874 S.W.2d at 275. There, the plaintiff sued the landlord of her apartment complex after she was injured by another tenant's dog in a common area where she and that tenant were each walking their respective dogs. Id. The court noted that "a landlord has [a] duty to keep the common areas of his property reasonably safe, including protecting tenants from known vicious dogs." Baker, 874 S.W.2d at 277. Refusing to reverse the summary judgment which had been granted in favor of the defendant-landlord, the court concluded that the plaintiff failed to meet her burden of proof regarding the landlord's knowledge of the dog's dangerous propensities. Id. The court set forth a two-part test: "(1) the injury must have occurred in a common area under the control of the landlord; and (2) the landlord must have had actual or imputed knowledge of the particular dog's vicious propensities." Id.
In the case sub judice, however, unlike in Linebaugh and Baker, the injury did not occur in the common area, but rather entirely within Morton's apartment where Tevin was playing. Importantly, where injuries have resulted from a dog attack occurring on portions of the premises where the tenant, not the landlord, had exclusive control, several cases have indicated that a landlord may not be held liable. See, e.g., Goddard by Goddard v. Weaver, 558 N.E.2d 853, 854-55 (Ind.Ct.App.1990); Zwinge v. Love, 37 A.D.2d 874, 325 N.Y.S.2d 107, 109 (N.Y.App.Div.1971)(holding that mother/owner of home in which attack occurred was not liable for attack by dog owned by son/tenant where there was no evidence that she exercised dominion and control over the dog); Denagy v. Doscher, 40 Misc.2d 643, 243 N.Y.S.2d 575, 576 (N.Y.Sup.Ct.1963) (dismissing complaint against landlord where there was "no allegation that the landlord had any control of the property or any part thereof where the dog was kept"). For example, in Goddard, the court refused to impose a duty on Weaver, the landlord, where the attack occurred in the yard of premises Weaver had leased to the dog's owners, the Maybriers. 558 N.E.2d at 854. Weaver and the Maybriers had entered into an oral agreement whereby the Maybriers could "use as yard what they chose to maintain." Id. The attack occurred on part of the land that the Maybriers maintained. Id. Acknowledging that generally landlords have a duty to maintain common areas, the court emphasized that the landlord "did not have control over the property where the attack occurred." Id.
The instant case is more analogous to those cases where an attack occurs outside, off the premises owned by the landlord. In such cases, courts have been reluctant to impose liability. See, e.g., Gibbons v. Chavez, 160 Ariz. 73, 770 P.2d 377 (App.1988); Ward v. Young, 504 So.2d 528 (Fla.Dist.Ct.App. 1987); Allen v. Enslow, 423 So.2d 616 (Fla. Dist.Ct.App.1982); Fernandez v. Marks, 3 Haw.App. 127, 642 P.2d 542 (1982); Feister v. Bosack, 198 Mich.App. 19, 497 N.W.2d 522 (1993); Wright v. Schum, 105 Nev. 611, 781 P.2d 1142 (1989). For example, in Fernandez, a Hawaii court held that a landlord could not be held liable when the tenant's vicious dog attacked plaintiffs off of the landlord's premises. 642 P.2d at 544. The court reasoned that to make a landlord liable in such a situation where the landlord was not the *144 owner or keeper of the dog and the injury occurred off the premises would have the effect of "making a landlord ... an insurer of the public against injuries, off the premises, by dogs domiciled by tenants on the landlord's premises." Id. In other words, to place liability on the landlord where the landlord retains no control would make the landlord in essence an insurer. As with areas off the premises, the landlord does not retain control within the leased premises. Thus, to place liability on the landlord for injuries occurring within the leased premises over which the landlord has given up control to the tenant is to make the landlord an insurer.

A. OTHER BASES FOR FINDING LANDLORD LIABILITY
Other bases for finding a landlord liable are similarly inapplicable. For example, this Court has found that a landlord may be liable where the landlord has contracted to repair the tenant's premises but fails to do so. Sacks v. Pleasant, 253 Md. 40, 45-46, 251 A.2d 858, 862 (1969) (upholding jury verdict finding landlord liable for failure to make repairs where the landlord had on numerous occasions, in response to tenant's requests and threats to move, promised to repair tenant's toilet seat); see also McKenzie v. Egge, 207 Md. 1, 6-7, 113 A.2d 95, 97 (1955) (noting that landlord could be held liable for failure to use reasonable care to make repairs where the following conditions are met: "there [is] a contractual undertaking to make repairs, notice of the particular defect, and a reasonable opportunity to correct it"); Miller v. Howard, 206 Md. 148, 154, 110 A.2d 683, 685-86 (1955). Likewise, we have held that such a duty may be imposed by statute.
Here, however, there is no statute that imposes a duty on the landlord to remove the pit bull from the leased premises, nor has the landlord contracted to remove vicious dogs. I do not believe that the lease in this case which prohibited tenants from keeping pets on the premises was equivalent to a promise on the part of the landlord to keep the premises free from pets. Even if it did, however, jurisdictions imposing liability for a promise look to whether reliance on the promise caused the injury to the plaintiff. See PROSSER AND KEETON ON THE LAW OF TORTS ง 56, at 379. Obviously, Ms. Matthews and Tevin did not act in reliance on that "promise." Moreover, it is clear that Ms. Matthews and Tevin knew of this pit bull and were aware of its presence in the apartment at the time of their visit as they had visited the apartment before when the pit bull was present.
The landlord was the owner of the premises and did not harbor Rampage. Several courts have used this same fact to refuse to impose liability on a landlord for injuries resulting from an attack by a tenant's dog. For example, in Zwinge, supra, the court stated:
"Although the owner of a dog, which he knows or has reason to know has a vicious propensity, is liable for injuries caused by it, as well as the harborer or keeper of such an animal, such a rule of liability has not been extended to a landlord who merely leases the realty to the owner of the dog." (Citations omitted).
325 N.Y.S.2d at 108. In Allison by Fox v. Page, 545 N.W.2d 281 (Iowa 1996), the Supreme Court of Iowa reviewed several other cases so holding:
"A landlord who is not even in possession of the land, but merely owns the property on which a tenant keeps animals, is ... not liable for injuries caused by the tenant's animals. See Bryant v. Putnam, 322 Ark. 284, 908 S.W.2d 338, 339 (1995) (landlord, who was not owner or keeper of dogs owned by tenant, was not liable to injured third party); Mathes v. Nolan, 904 S.W.2d 353, 356 (Mo.App.) (same), application to transfer denied, 904 S.W.2d 353 (1995); Barnett [by Barnett] v. Rowlette, 879 S.W.2d 543, 544 (Mo.App.) (landlord not liable for tenant's dog because landlord did not own, possess or harbor the dog, even though landlord knew dog was vicious and allowed dog to remain on the leased premises), application to transfer denied, 879 S.W.2d 543 (1994); Gonzales v. Wilkinson, 68 Wis.2d 154, 227 N.W.2d 907, 910 (1975) (landlord, who was not the keeper or owner of the tenant's dog and who had no control over the animal, had no duty to protect third persons). We adhere to *145 these principles and reject the opportunity to extend the common law."
545 N.W.2d at 284. A similar holding was fashioned by the Washington Court of Appeals in Clemmons v. Fidler, 58 Wash.App. 32, 791 P.2d 257, review denied, 115 Wash.2d 1019, 802 P.2d 125 (1990):
"[T]he common law rule applies: only the owner, keeper, or harborer of the dog is liable for such harm.

* * *
The common law rule, which is the settled law of Washington, is clear: only the owner, keeper or harborer of such a dog is liable. The landlord of an owner, keeper or harborer is not."
791 P.2d at 259.
These cases are consistent with the approach taken by the RESTATEMENT (SECOND) OF TORTS. According to the RESTATEMENT (SECOND) OF TORTS ง 513 (1977), one who possesses "an abnormally dangerous domestic animal who keeps it upon land in his possession[ ] is subject to strict liability to persons coming upon the land in the exercise of a privilege whether derived from his consent to their entry or otherwise." It is clear in this case, however, that Respondents were not in possession of Rampage. Rather, owned by Morton's boyfriend, Rampage was in Morton's possession. The RESTATEMENT (SECOND) OF TORTS ง 514 extends the same liability to "[o]ne who, although not in possession, harbors ... an abnormally dangerous domestic animal." Comment a to ง 514, however, clarifies that the mere "possession of the land on which the animal is kept, even when coupled with permission given to a third person to keep it, is not enough to make the possessor of the land liable as a harborer of the animal." See also, e.g., Barnett by Barnett v. Rowlette, 879 S.W.2d 543, 544 (Mo.Ct.App.1994).
Respondents did not "harbor" Rampage. A harborer of an animal is one who "afford[s] lodging to, to shelter, to give a refuge to." See Hancock v. Finch, 126 Conn. 121, 9 A.2d 811, 811 (1939). Here, Respondents did not give lodging or shelter to Rampage, but rather merely owned the property on which Morton gave Rampage shelter. As discussed above, this mere ownership of property is not enough to conclude that the landlord was the harborer of Rampage. Additionally, in this case, Respondent did not give permission for Rampage to be on the premises and in fact expressly prohibited Rampage's presence through the provisions of the lease. Thus, Respondents did not harbor Rampage and therefore could not be liable as an owner or harborer of an abnormally dangerous domestic animal.
Finally it is noteworthy that the lease in this case was for a private dwelling, and it is clear that the premises were not leased for public or quasi-public purposes. Cf. Austin v. Buettner, 211 Md. 61, 74-75, 124 A.2d 793, 800-01 (1956) (recognizing a landlord's duty for injuries sustained on leased premises where the landlord is aware that the premises are leased with intent to admit the public).

THE LEASE AS A SOURCE OF LANDLORD CONTROL
Uccello v. Laudenslayer, 44 Cal.App.3d 504, 118 Cal.Rptr. 741 (1975), is perhaps the most compelling case with respect to Petitioners' argument. In Uccello, an intermediate appellate court in California held "that a duty of care arises when the landlord has actual knowledge of the presence of the dangerous animal and when he has the right to remove the animal by retaking possession of the premises." 118 Cal.Rptr. at 743. There, the landlord gave a month-to-month tenant permission to keep a dog on the premises. The plaintiff, a five-year-old child, was attacked by the dog while playing on the kitchen floor with the tenant's daughter in the tenant's apartment. The plaintiff sued the landlord. Uccello, 118 Cal.Rptr. at 743-44.
Reversing a judgment of nonsuit, the court noted that the landlord in that case could have abated the harboring of the dog by terminating the month-to-month tenancy. Uccello, 118 Cal.Rptr. at 746-47. The court emphasized that the general rule "preclude[s] a landlord's liability for injuries to his tenant or his tenant's invitees from a dangerous condition on the premises which comes into existence after the tenant has taken possession." Uccello, 118 Cal.Rptr. at *146 745. The court, however, noted that several exceptions had been carved out of this general rule, such as (1) where the landlord covenants to repair, (2) where the landlord has actual knowledge of a hidden defect and fails to disclose the defect, (3) where a nuisance exists when the landlord leases or renews a lease, (4) when a safety law has been violated, and (5) where the injury occurs in a common area. Uccello, 118 Cal.Rptr. at 746 (citations omitted). The court reasoned that these exceptions were premised on the landlord's retention of "a recognizable degree of control over the dangerous condition with a concomitant right and power to obviate the condition and prevent the injury." Uccello, 118 Cal.Rptr. at 746. Based on what it called "enlightened public policy," the court concluded that the landlord retains sufficient control where the landlord has the right to terminate a lease and thus obviate the presence of the vicious animal. Uccello, 118 Cal. Rptr. at 746-47. Thus, although the landlord had leased the entire premises to the tenant, the California intermediate appellate court found that the landlord gave express permission to keep the dog as well as retained control or power to eliminate the danger at issue in the case through the landlord's right to evict the tenant unless the tenant got rid of the dog.
The opinions of some other courts suggest support for this view. See, e.g., Gallick v. Barto, 828 F.Supp. 1168, 1175 (M.D.Pa.1993) (concluding that "No Pets" clause in lease gave landlord control over premises and thus landlord " `stepped into the shoes' of the tenants concerning liability" for injuries sustained as result of an attack by a pet ferret kept by tenant); McCullough v. Bozarth, 232 Neb. 714, 442 N.W.2d 201, 208 (1989) (affirming summary judgment for the landlord because plaintiff failed to allege that the landlord had "sufficient control over the premises" and no evidence was presented of the terms of the lease, but noting that a landlord may be liable if he knew of "the dangerous propensities of the dog and where the landlord ..., by the terms of the lease, had the power to control the harboring of a dog by the tenant and neglected to exercise that power"); Cronin v. Chrosniak, 145 A.D.2d 905, 536 N.Y.S.2d 287, 287-88 (1988) (reversing trial court's grant of summary judgment for the landlord and noting that while "[a] landlord not in possession of the premises is usually not liable for injuries inflicted by an animal owned or harbored by a tenant, ... if during the term of the leasehold a landlord becomes aware of the fact that his tenant is harboring an animal with vicious propensities, he owes a duty to protect third persons from injury only if he `had control of the premises or other capability to remove or confine the animal' ")(quoting Strunk v. Zoltanski, 62 N.Y.2d 572, 479 N.Y.S.2d 175, 177, 468 N.E.2d 13 (1984)); Palermo v. Nails, 334 Pa.Super. 544, 483 A.2d 871, 873 (1984) (specifically adopting the Uccello approach and holding landlord liable where landlord had ability to eject tenant who was landlord's nephew and whose tenancy was "nothing more than a tenancy at sufferance"). Many other courts, however, have rejected the Uccello approach. See, e.g., Feister, 497 N.W.2d at 525; Wright, 781 P.2d at 1143; Clemmons, 791 P.2d at 260; cf. Frobig v. Gordon, 124 Wash.2d 732, 881 P.2d 226, 227, 231 (1994) (refusing to impose a duty on landlord of commercial premises where third party was attacked by a tiger owned by tenant who ran a business providing wild and domestic animals for demonstrations, films, and videos; specifically rejecting Uccello's framing of the issue as a question of morality).
I am unpersuaded by the Uccello line of cases and agree with the courts that hold sound public policy dictates a rejection of the Uccello approach.[1] In Clemmons, the Court *147 of Appeals of Washington specifically rejected the Uccello approach, noting that the rule rejecting Uccello "promotes the salutary policy of placing responsibility where it belongs, rather than fostering a search for a defendant whose affluence is more apparent than his culpability." 791 P.2d at 260. The Supreme Court of Washington reiterated Washington's rejection of the Uccello approach in the analogous case of Frobig. In that case, the court held that the landlord had "no duty to protect third parties from a tenant's lawfully owned but dangerous animals." Frobig, 881 P.2d at 231. The court specifically rejected the Uccello court's framing of the issue as a question of morality. Id. I would agree because as we have said "[a] tort duty does not always coexist with a moral duty." Jacques v. First Nat'l Bank, 307 Md. 527, 534, 515 A.2d 756, 759 (1986).
Also specifically rejecting the Uccello approach, a Michigan court, in Feister, 497 N.W.2d at 525, affirmed a grant of summary judgment for a landlord following the reasoning expressed by the Supreme Court of Nevada in Wright: "[H]olding landlords liable for the actions of their tenants' vicious dogs by requiring them to evict tenants with dangerous dogs would merely result in the tenants' moving off to another location with their still dangerous animals.... [T]his approach [is like the case of] a `Typhoid Mary,' who was outcast from one place only to continue her deadly disease-spreading activity at another place." Wright, 781 P.2d at 1143. I believe that this reasoning is applicable here. In the instant case, the record indicates that Petitioners were close personal friends with Morton and that they had visited her at her previous residence. Thus, not only is it possible that if Morton were evicted others would have been exposed to the danger of Rampage, but it is also likely that Petitioners themselves would have been exposed to the same danger. In other words, even if the landlord had taken steps to terminate the tenancy, there is no reason to believe that this would have prevented Tevin's death.
I would point out that in some cases where landlords were held liable it was because the leases contained a clause that prohibited tenants from keeping vicious dogs and annoying pets; the theory of recovery was that the landlords had undertaken a specific duty to protect others from tenants' vicious pets. See, e.g., Alaskan Village, Inc. v. Smalley, 720 P.2d 945, 948 (Alaska 1986). The rationale is that although generally, in the absence of an agreement to the contrary, a landlord does not have a duty to make repairs, once the landlord has undertaken to make the repairs, the landlord may be liable if he or she acts negligently in making those repairs. Miller, 206 Md. at 154-55, 110 A.2d at 685-86.
In Alaskan Village, the Supreme Court of Alaska affirmed a jury verdict against Alaskan Village, the owner of a trailer park, for injuries sustained by Monica Smalley, who was attacked by two dogs belonging to Henry Scepurek, one of the residents of the trailer park. 720 P.2d at 946. The lease between Alaskan Village and Scepurek contained a clause prohibiting tenants from keeping "vicious dogs." Id. Scepurek had two small dogs for which he obtained permits from Alaskan Village to keep on the premises. Id. The permit, however, included a *148 promise by Scepurek "to remove the pets from the premises immediately upon notice that they annoyed other tenants." Id. Sometime before the attack on Smalley, Scepurek obtained two more dogs, both pit bulls. Alaskan Village, 720 P.2d at 947. These two pit bulls were the ones that eventually attacked Smalley. Id. Smalley argued "that [Alaskan] Village had a duty to use reasonable care to enforce its rules, and a duty to exercise reasonable care under these circumstances." Id. Relying in part on the RESTATEMENT (SECOND) OF TORTS ง 323 (1965),[2] the court agreed. The court found that, by prohibiting tenants from keeping vicious dogs and further requiring Scepurek to promise to remove annoying pets, the landlord undertook the obligation to control vicious dogs in its trailer park, i.e., keep the premises free from vicious dogs. Alaskan Village, 720 P.2d at 948. Significantly, the court also noted that "evidence that the undertaking is for the plaintiff's benefit is a prerequisite to liability; a plaintiff who does not produce such evidence is not entitled to a jury instruction on this theory." Alaskan Village, 720 P.2d at 947; see also Goddard by Goddard, 558 N.E.2d at 854-55 (holding landlord was not liable because landlord had relinquished control despite landlord's distribution of notices to residents telling them to keep their dogs "tied or inside" because evidence suggested that the reason for notice was that landlord had received complaints about barking and trash removal and not to protect others).
The instant case, however, is distinguishable from Alaskan Village in that Respondents' lease with Morton prohibited all pets, not just vicious ones. It appears that Alaskan Village's agreements with its residents were intended to protect other tenants from being bothered physically or otherwise by the pets of other residents. No such conclusion can be made regarding Respondents' agreements with their residents. The Alaskan Village lease specified no vicious dogs, whereas in the present case, the lease prohibits all pets. This presumably could include even goldfish. Thus, the Alaskan Village lease could much more reasonably be found to be intended to keep tenants safe; whereas the lease in the present case could just as likely be intended to protect the landlord's property.
Moreover, unlike in the instant case, the plaintiffs in Alaskan Village were tenants and, thus, more likely to be the intended beneficiaries of the lease provision. Finally, it is noted that the "no pets" clause in the instant case appeared in a laundry list of other prohibitions, many of which cannot be construed as being for the protection of other tenants. The lease included, among other things, a requirement that the tenant "provide management with names, addresses, telephone numbers and relationships of persons to be notified in case of emergency." The lease also prohibits tenants from "install[ing] carpeting in the apartment without written permission from management," using "venetian blinds, shades, awnings, or window guards, except as permitted in writing by the owners" and "plac[ing], erect[ing] or expos[ing] any sign, advertisement, illumination, aerial or other projection on the window, roof or other part of the building." Thus, unlike the lease and agreement in Alaskan Village, the lease in the instant case cannot be the premise for finding that the landlord retained sufficient control over the premises to form the basis of liability.

CONTROL BY THE LANDLORD
Even if we disregard the prior cases holding the landlord has no duty toward people injured by dangerous conditions created by the tenant inside non-public leased premises, and even if the Court wanted to join the minority of courts that follow Uccello, there should still be no liability because the landlord had no control over Rampage. In the *149 instant case the landlord had no control over what happened inside the tenant's residence because, contrary to the assertion of the majority, the landlord had no right to evict the tenant for keeping a dog. Ms. Matthews' theory of recovery is that the landlord had control over the dog and could have prevented her child's injuries by evicting her friend for violating the "no pets" clause in the friend's lease, but under this lease the landlord could not have evicted the tenant for violation of the "no pets" clause for two separate and distinct reasons. First, the lease did not provide that the landlord could repossess the premises for a breach of the "no pets" clause. Second, even if the lease had so provided, the landlord had waived the right to terminate the lease for violations of the "no pets" clause as to this tenant and probably for all of the tenants in the development.
The relevant statutory provision on termination of leases for breaches other than for failure to pay rent is Maryland Code (1974, 1996 Repl.Vol., 1997 Supp.), Real Property Article, ง 8-402.1, which "vests authority in the District Court, under certain circumstances, to order the eviction of a tenant for breach of the tenant's lease." Saundra Brown v. Housing Opportunities Commission of Montgomery County, 350 Md. 570, 572, 714 A.2d 197, 197 (1998). That statute provides in pertinent part:
" ง 8-402.1. Breach of lease.
(a) Complaint to District Court; summons to appear, notice; continuance.โ When a lease provides that the landlord may repossess the premises if the tenant breaches the lease, and the landlord has given the tenant 1 month's written notice that the tenant is in violation of the lease and the landlord desires to repossess the premises, and if the tenant or person in actual possession refuses to comply, the landlord may make complaint in writing to the District Court of the county where the premises is located. * * *
(b) Judgment of District Court; appeal.โIf the court determines that the tenant breached the terms of the lease and that the breach was substantial and warrants an eviction, the court shall give judgment for the restitution of the possession of the premises and issue its warrant to the sheriff or a constable commanding him to deliver possession to the landlord in as full and ample manner as the landlord was possessed of the same at the time when the lease was entered into." (Emphasis added).
Md.Code (1974, 1996 Repl.Vol., 1997 Supp.), Real Property Art., ง 8-402.1. See also DOUGLS M. BREGMAN & GARY G. EVERNGAM, MARYLAND LANDLORD-TENANT LAW PRACTICE AND PROCEDURE, at 92 (2d ed. 1994)("Section 8-402.1 permits an action for repossession in the event of a breach of a lease which contains a provision allowing the landlord to repossess in the event of a breach."). The lease at issue in the instant case contained a "no pets" clause but does not contain any provision permitting the landlord to repossess in the event of a breach, and therefore, the landlord had no way to evict a tenant with a dog until the lease period ended. Cf. Kimberly Shields v. Arthur Wagmar, 350 Md. 666, 714 A.2d 881 (1998), where the lease period had ended and the tenant was a month-to-month tenant.
The probable reason why the lease did not provide that breach of the "no pets" clause would permit the landlord to repossess the premises becomes apparent when we examine that clause. The "no pets" clause was for the protection of the landlord, not for the protection of others; it did not bar only vicious pets or only dangerous pets, it barred all pets from even being on the premises. When the "no pets" clause is examined in context, it is obvious why the parties intended that violations of "House Rules" were not substantial breaches justifying repossession by the landlord. The lease provides: "Covenants No. 1 to No. 30 which appear on the reverse side of this Lease Agreement and Covenants No. 1 to No. 39 which appear on Lease Agreement Exhibit B. are a part of this contract and Lessee acknowledges that he read and agreed to such covenants."
Covenants number 1 through 30 are on the last page of the lease and are headed "House Rules." The provision states: "The resident agrees to comply with the following rules and regulations which shall be deemed to be a *150 part of the lease. Breach of these rules and regulations shall be deemed to be a default of the lease." Without setting forth all 30 of the covenants or house rules some examples of these rules include:
"2. Not obstruct nor use any of the stairways and sidewalks for any other purpose than for ingress to, and egress from the demised premises;
4. No baby carriages, bicycles, carts or hand trucks are to be left in the common areas or courts of the development;
6. Not place or hang anything from windows or place upon window sills;
7. Not shake or hang any tablecloths, bedding, clothing, curtains or rugs from any of the windows or doors;
9. Not use venetian blinds, shades, awnings, or window guards, except as permitted in writing by the owners;
10. Not make any alterations, additions or improvements to the apartments of the demised premises, including, but not limited to the painting thereof, the installation of wallpaper, T.V. or other antennas, screens or other enclosures;
15. Not to install carpeting in the apartment without written permission from management;
16. Not to store personal items outside of the apartment;
18. Not to have any pets on the premises.
30. Resident agrees to maintain the electric service to the apartment during the term of his/her tenancy." (Emphasis added)
Not only did the lease fail to provide that breach of any of the 30 "House Rules" or covenants would permit the landlord to repossess the premises, it is obvious that this was a deliberate omission and a tenant's violation of one or more of the "House Rules," although "defaults," were not substantial breaches and should not result in the tenant forfeiting the lease. The lease and relevant statutes are quite clear; the landlord could not have evicted Ms. Morton for violating the "no pets on the premises" clause.
There is another reason why the landlord could not evict Rampage's owner. The "no pets" clause was inserted by the landlord and could be waived by the landlord. Since the landlord found out about the tenant's dog in October and still accepted November's rent, December's rent, January's rent, and February's rent, even before the attack in February, the landlord had already lost any ability to evict the tenant. In Chertkof v. Southland Corp., 280 Md. 1, 371 A.2d 124 (1977), we summed up the law on a landlord's waiver of breaches by the tenant and said:
"Thus, we apply in Maryland the universal rule that a waiver of forfeiture may occur by an acceptance of rent which accrues after the lessor is on notice that a breach has been committed by the lessee. Ammendale Normal v. Schrom, [264 Md. 617, 624, 288 A.2d 140, 143-44 (1972) ]; Morrison v. Smith, 90 Md. 76, 83, 44 A. 1031[, 1032] (1899); cf. In Re Hook, 25 F.2d 498, 499 (D.Md.1928) (distraint for rent, accruing after right to declare forfeiture, constituted waiver; `[t]he acceptance of rent, eo nomine, generally, if not always, has [the effect of waiving the forfeiture]'). The underlying rationale for the rule is simple enough: acceptance of rent accruing after the breach is an affirmation of the tenancy and a recognition of its continuation; in effect, the lessor elects to continue the relationship of landlord and tenant."
280 Md. at 5-6, 371 A.2d at 127.
The landlord apparently recognized the inability to terminate leases for violation of the "no pets on the premises" clause because one of the plaintiff's witnesses testified that many of the tenants had dogs. For the indicated reasons, the landlord could not have evicted Ms. Matthews' friend, and therefore, the landlord had no control over Rampage's presence within the tenant's apartment until the tenant's lease expired. The tenant brought the dog into the apartment, and the tenant maintained and had sole control over the dog. Ms. Matthews' cause of action is against the tenant.
Requiring landlords to enforce "no pets" clauses will probably not make dog owners give up their pets; it will just make them *151 more mobile, and probably would not have prevented the injury in the instant case. The Nevada Supreme Court, in Wright v. Schum, supra, held that landlords are not liable for injury to third persons caused by their tenants' pets, and one of the reasons it gave is particularly appropriate to the instant case.
"[H]olding landlords liable for the actions of their tenants' vicious dogs by requiring them to evict tenants with dangerous dogs would merely result in the tenants' moving off to another location with their still dangerous animals."
781 P.2d at 1143.
In the instant case, Ms. Matthews and Ms. Morton were lifelong friends. Ever since they were children, Ms. Matthews visited her friend with the same frequency everywhere her friend lived. There is every reason to believe she would have continued to visit her friend wherever she lived, even if the landlord had evicted her for keeping a dog.
The majority makes another inaccurate appellate factual finding when it states:
"Even before bringing such an action, the landlord, when it first received notice of the dangerous incidents involving Rampage, could have informed Morton that harboring the pit bull was in violation of her lease, could have told her to get rid of the aggressive animal, and could have threatened legal action if she failed to do so."
351 Md. at 558, 719 A.2d at 126. Rampage was owned by the father of Ms. Morton's son, and she was keeping Rampage while he was in prison. We cannot speculate that she would have or could have made other arrangements for the dog. In addition, to even suggest the landlord could fulfill its legal obligations by writing Ms. Morton to tell her of the terms of her own lease seems rather strange in light of the legal presumption that she knows the terms of the lease she entered into.

CONCLUSION
In the instant case, the tenant was in sole control of the premises where the injury occurred, and the tenant had the sole opportunity to protect her guests from the dog and failed to do so. Even if the landlord knew the dog had vicious tendencies, the landlord should be able to assume that when the dog was confined within the tenant's apartment that the tenant would take reasonable precautions to protect guests in her home. Moreover, there may be tenants who have a legitimate desire to keep watch dogs or guard dogs for the protection of their person or property, and this practice is not necessarily to be discouraged if the tenant keeps the dog controlled whenever it is off the tenant's premises or confined to the tenant's premises.
Thus, for the reasons set forth above, I would conclude that under the circumstances of this case there was no special duty on the part of the landlord to act affirmatively to protect Tevin or other social guests of the tenant, and therefore, the landlord may not be held liable for failing to take measures to enforce the "no pets" clause in the lease.
The instant case is controlled by the many Maryland cases that have held that if a landlord demises premises which are not in themselves a nuisance, but may become such according to the way in which they are used by the tenant, the landlord will not be liable for a nuisance created by the tenant. See, e.g., Maenner, 46 Md. at 216; Marshall, 162 Md. at 689, 161 A. at 172 (Landlord demising premises not nuisance in itself is not liable for nuisance created thereon by tenant.). The difference between the cited cases holding a landlord liable because of the landlord's affirmative actions and the instant case where the nuisance was created solely by the tenant, where we have consistently held the landlord is not liable, is explained by Prosser and Keeton:
"In Heaven v. Pender, Brett, M.R., afterwards Lord Esher, made the first attempt to state a formula of duty. `Whenever one person,' he said, `is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person *152 or property of the other, a duty arises to use ordinary care and skill to avoid such danger.' But this formula, which afterwards was rejected by Lord Esher himself, was soon recognized as far too broad. As a general proposition to be applied in the ordinary negligence case, where the defendant has taken some affirmative action such as driving an automobile, it holds good. That is to say, that whenever the automobile driver should, as a reasonable person, foresee that his conduct will involve an unreasonable risk of harm to other drivers or to pedestrians, he is then under a duty to them to exercise the care of a reasonable person as to what he does or does not do. There are, however, a good many defendants, and a good many situations, as to which there is no such duty. In other words, the defendant is under no legal obligation toward the particular plaintiff to act with the care of a reasonable man, and he is not liable even though his conduct falls short of that standard, and the other is injured as a result."
W. PAGE KEETON, PROSSER AND KEETON ง 53 at 358 (5th ed.1984).

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Reversing the trial judge's judgment N.O.V. and reinstating a $350,000 jury verdict for intentional infliction of emotional distress is so contrary to our prior cases on that tort that it simply deserves no discussion, and to sustain a damage verdict on an improper intentional tort because the plaintiff might have been entitled to some damages on a proper negligence count is equally absurd. There is no need to go into the elements of intentional infliction of emotional distress because the majority seems to acknowledge that there was no basis for the jury determination that the landlord committed an intentional infliction of emotional distress. The jury awarded Ms. Matthews over one million dollars for intentional infliction of emotional distress. It is reasonable to assume that the improper finding of intentional conduct played some part in the jury's calculation of damages. It is unwarranted speculation to even suggest it would have awarded the same amount for any negligently inflicted emotional injury she suffered during the attack and prior to the son's death. We never have and never should treat a jury award on an improper intentional tort count as interchangeable with an award on a negligence count.

CONTRIBUTORY NEGLIGENCE
Ms. Matthews and Tevin had both visited the apartment and Rampage on at least a weekly basis for months and months. Ms. Matthews had far, far greater knowledge of Rampage than did the landlord or any of the landlord's employees and she permitted her son to play throughout the apartment with and around the dog without direct supervision. The majority states: "The extreme dangerousness of [Rampage's] breed, as it has evolved today, is well recognized," 351 Md. at 561, 719 A.2d at 127, but is this well recognized knowledge about pit bulls confined to or chargeable only to landlords? Surely a jury ought to be permitted to determine whether Ms. Matthews was also negligent and, if so, whether her negligence was a contributing cause of her injuries. Allowing her infant son's unsupervised play in another room with this "extremely dangerous instrumentality," 351 Md. at 560, 719 A.2d at 126, could be found by a jury to be at least as negligent as the landlord's negligence in not evicting the dog's owner. We have never before held that a parent's contributory negligence in the death of a child does not bar or at least reduce the parent's own recovery for the wrongful death of a child, and the majority cites no bases for its holding that Ms. Matthews' contributory negligence would not bar or reduce her portion of the wrongful death recovery. I recognize that contributory negligence would not affect the survival action or Tevin's father's recovery. But even if the majority is correct on this aspect of contributory negligence, it would still be a defense to Ms. Matthews' recovery for the landlord's negligently inflicted emotional distress.

INTERVENING CAUSE
Even if we assume that the landlord was negligent, we must look at the cause or causes of the harm in the instant case. I am gratified that the Court is retreating from *153 some loose language in a few prior opinions indicating that, if a party provides the judge with an instruction on an issue and the instruction is not an accurate statement of the law, the trial judge has some obligation to redraft the instruction if the issue is generated. I agree that the trial judge should not have this responsibility. In the instant case, however, the trial judge did not rule that the instruction was improperly drafted; the trial judge ruled that the issue was not generated. In addition, the majority does not tell us, and I do not see why the instruction on intervening superseding cause was erroneous. The instruction is an accurate statement of the law as expounded by this Court, and while it may not be correct or accurate for all cases, it seems appropriate in the instant case and should have been given. We have said: "[A]lthough an injury might not have occurred "but for" an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury...." Hartford Ins. Co. v. Manor Inn, 335 Md. 135, 156, 642 A.2d 219, 230 (1994) (quoting Peterson v. Underwood, 258 Md. 9, 16, 264 A.2d 851, 855 (1970) (citations omitted)). This certainly seems appropriate language for a jury instruction, and is almost identical to the instruction proposed in the instant case.
The only person Rampage ever bit was this 16-month-old child, and as previously noted, the jury could find that Rampage's sudden, focused attack on a frequent visitor like Tevin was caused by some provocation from this 16-month-old child. Contrary to the majority's assumption, a jury could reasonably conclude that a landlord might not foresee that parents would permit a very young child to play with and provoke this "pit bull." If this dog is so well recognized as highly dangerous, a jury could find that the landlord, in not evicting the tenant, was passive, but Ms. Matthews allowing a 16-month-old child to play throughout the apartment with this pit bull was the active cause of the injury. A jury should also be permitted to determine whether the landlord could reasonably assume that a parent would not permit a very young child to play with and around this dog that the majority claims is widely known to be highly dangerous. Under these reasonable fact findings, Ms. Matthews' act of permitting Tevin to play with Rampage throughout the apartment and out of her sight could constitute an intervening superseding cause.
In finding the landlord had a duty to safeguard Tevin, the majority seems to equate duty with the power to prevent; if so, Ms. Matthews could have successfully sued everyone who lived in the building. If, as the majority seems to hold, this dog's mere presence constituted a dangerous nuisance, then any neighbor could have brought an action to abate the nuisance. I trust the majority would hold their failure to abate the danger does not make them liable. A landlord has a duty to people in the common area under the control of the landlord, and the landlord has a duty toward people that the landlord's active negligence may injure. Active negligence may include renting to a person possessing a vicious dog or even continuing a month-to-month tenancy with a person possessing a vicious dog. It would include negligently permitting a vicious dog in the common area, but it has never included failure to protect a tenant's social guests from things exclusively under the tenant's control within the tenant's dwelling. I respectfully dissent.
Judge CATHELL has authorized me to state that he joins in the views expressed in this dissenting opinion.
NOTES
[1] Although the defendants' manager and assistant manager contradicted the above-summarized testimony about reports of the incidents being given to them, the jury obviously did not credit their testimony in this regard.
[2] At trial a manager employed by the defendants testified that a procedure for the notification of tenants that they were in breach of their lease was in place and that the use of pre-printed forms enabled such notification to be carried out in less than ten minutes.
[3] The defendants also assert that it is not certain" that the landlord would have been successful with an eviction procedure before February of 1994, when the attack occurred." (Defendants' brief in this Court at 30-31). If the landlord had promptly instituted an eviction proceeding, however, the landlord would have done what it could and thus would have fulfilled its duty even if the legal proceeding did not result in the tenant's eviction before February 9, 1997. Furthermore, the testimony indicated that the defendants received reports of the incidents involving Rampage for a considerable period of time before the attack. One witness stated that he reported incidents to the managers for a two month period.

Pursuant to Maryland Code (1974, 1996 Repl. Vol., 1997 Supp.), ง 8-402.1 of the Real Property Article and Code of Baltimore City Public Local Laws, Art. 4 งง 9-3, 9-12, 9-14, and 9-19 (1980, 1997 Cum.Supp.), possession of the leased premises may be restored to the landlord in less than forty-five days after notice is given to a tenant that she is in breach of her lease.
Baltimore City Public Local Law ง 9-12 permits a landlord to terminate a tenancy if he complies with the requirements of Baltimore City Public Local Law ง 9-14. Section 9-14(1) or (2) requires a landlord to give a tenant thirty days notice prior to termination of the lease if the tenant "is violating an obligation of his tenancy" or "the tenant is committing or permitting a nuisance on the premises...." Once a landlord has complied with these notice requirements he is entitled to the "benefit of the law providing for the speedy recovery of the possession of lands or tenements held over by tenants." ง 9-19. The aforementioned speedy recovery procedures are codified in ง 9-3 and provide that, subject to notice requirements, five days after the filing of a complaint in District Court a hearing on the merits will be held. If the judge determines that the property should be restored to the landlord then the tenant must "yield and render up possession of ... the premises" within two days of the judgment. ง 9-5.
See the recent opinion of Judge Wilner for the Court in Brown v. Housing Opportunities Commission, 350 Md. 570, 714 A.2d 197 (1998), for an extensive discussion of the procedures for ordering the eviction of a tenant for breach of the lease.
[4] A number of states or municipalities, recognizing the unique danger pit bull dogs pose to their citizens, have enacted legislation that classify pit bull dogs as vicious, thus enabling them to control or ban this breed's presence in their communities. See, e.g., City of Maumelle, Arkansas Ordinance No. 36, ง 7 (1988); Rev. Mun.Code of Denver, Colorado ง 8-55 (1989); Dade County, Fla. Ordinance No. 089-22 (1989); City of North Miami, Fla. Ordinance No. 422.5; Municipal Code of the City of Des Moines, Iowa, ch. 7, subch. 2, งง 7-13 (1987); Overland Park, Kansas Municipal Code Ch. 6.10 (1987); Village of Tijeras, New Mexico Ordinance No. 32, ง VI, para. I (1984); Ohio Rev.Code Ann. ง 955.11(A)(4)(iii) (1980); Township of Chester, Pa., Ordinance No. 1-1986 (1986); City of Richardson, Texas Ordinance งง 3-1, 3-15, 3-17; North Salt Lake City, Utah Animal Control Ordinance ง 13-20-16 (1987); Yakima City, Washington Ordinance 3034 (1987), codified in Yakima City Code 6.18.010 et seq.; Municipal Code of the City of South Milwaukee, Wisconsin ง 23.20.

Moreover, courts have upheld these enactments, noting that the inherent viciousness of pit bulls provide a rational basis for such legislation. See American Dog Owners Association, Inc. v. Dade County, 728 F.Supp. 1533, 1538 (S.D.Fla. 1989); Starkey v. Township of Chester, 628 F.Supp. 196, 197 (E.D.Pa.1986); Holt v. City of Maumelle, 307 Ark. 115, 119, 817 S.W.2d 208, 210-211 (1991); Colorado Dog Fanciers, Inc. v. City and County of Denver, 820 P.2d 644, 652 (Colo.1991); State v. Peters, 534 So.2d 760, 764 (Fla.App. 1988); review denied, 542 So.2d 1334 (Fla. 1989); American Dog Owners Assoc., Inc. v. City of Des Moines, 469 N.W.2d 416 (Iowa 1991); Hearn v. City of Overland Park, 244 Kan. 638, 648-650, 772 P.2d 758, 766-768, cert. denied, 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989); Garcia v. Village of Tijeras, 108 N.M. 116, 119-121, 767 P.2d 355, 358-360 (N.M.Ct. App.), cert. denied, 107 N.M. 785, 765 P.2d 758 (1988) ("evidence establishing that the American Pit Bull Terrier breed possesses inherent characteristics of aggression, strength, viciousness and unpredictability not found in any other breeds of dog ... more dog-bite incidents are caused by American Pit Bull Terriers than by other breeds... [e]xtraordinary measures are required for confining American Pit Bull Terriers, such as a six-foot chainlink fence with an overhanging ledge to keep the dogs from jumping out," and that the Albuquerque Humane Society reported that no other breed of dog has "ever caused the kinds of injuries or exhibited the aggressive behavior shown by American Pit Bull Terriers ... [and the humane society does not] adopt out pit bull dogs because of their potential for attacks on other animals and people"); State v. Anderson, 57 Ohio St.3d 168, 169, 174, 566 N.E.2d 1224, 1225, 1229, cert. denied, 501 U.S. 1257, 111 S.Ct. 2904, 115 L.Ed.2d 1067 (1991) (harboring a "dog commonly known as a pit bull dog" is prima facie evidence of ownership of a vicious dog); City of Richardson v. Responsible Dog Owners of Texas, 794 S.W.2d 17 (Tex. 1990); Greenwood v. North Salt Lake City, 817 P.2d 816, 821 (Utah 1991) (pit bull dogs "are known for a unique combination of strength, agility, tolerance for pain, ... aggressiveness ... were historically bred for fighting and killing, ... have experienced a proportionately higher number of bites and attacks ... [and] that Animal Control treats pit bull dogs differently than other breeds"); American Dog Owners Assoc. v. City of Yakima, 113 Wash.2d 213, 217, 777 P.2d 1046, 1048 (1989); Dog Federation of Wisconsin, Inc. v. City of South Milwaukee, 178 Wis.2d 353, 367, 504 N.W.2d 375, 381 (Wis.Ct.App.), review denied, 508 N.W.2d 423 (Wis. 1993).
[5] In response to an alarming number of attacks by pit bull dogs on the citizenry of Maryland, several local jurisdictions are considering enacting legislation concerning the breed. See The Montgomery County Journal, A1, July 1, 1998; The Washington Times, C3, July 1, 1998; The Sun, Baltimore, 1B, July 16, 1998; The Capital, Annapolis, A1, September 11, 1998; The Sun, Baltimore, 1B, September 11, 1998.
[6] Both sides and the trial court were of the view that damages for Matthews's emotional distress after Tevin's death were encompassed by the wrongful death count, which was count I.
[1] Even in cases where landlord liability has been premised on the ability of the landlord to evict the tenant for harboring the animal that caused the injuries, there must have been sufficient time to evict between the point in time when the landlord became aware of the dog and its viciousness and the attack. See, e.g., Fernandez v. Marks, 3 Haw.App. 127, 642 P.2d 542, 544 (1982)(noting that 28-day notice requirement would have prevented landlord from evicting the dogs' owner prior to the dog-biting incidents in question); Feister v. Bosack, 198 Mich.App. 19, 497 N.W.2d 522, 525-26 (1993)(noting that, even if the ability to evict was equivalent to control, there was insufficient time for the landlord to have evicted because the event giving rise to notice occurred a "scant two days" before the plaintiff was injured and thus the landlord would have been unable to evict under Michigan law which requires a minimum of 30 days notice); Roy v. Neibauer, 191 Mont. 224, 623 P.2d 555, 556 (1981) (holding that landlord was not liable where dog injured child nine days after landlord-tenant relationship was established and where the lease called for 30 days notice before it could be terminated); Meyers v. Haskins, 140 A.D.2d 923, 528 N.Y.S.2d 738, 739 (1988) (affirming denial of summary judgment for landlord and noting that landlord could be liable for injuries resulting from attack by tenant's dog where the dog's presence was visible and apparent and existed long enough before the injury to permit the landlord to remedy the defect); Shafer v. Beyers, 26 Wash.App. 442, 613 P.2d 554, 557 (1980) (noting that two or three-day period between notice and the plaintiff's injury was insufficient to evict). But see Giaculli v. Bright, 584 So.2d 187, 189 (Fla.Dist.Ct.App.1991) (determining that question of whether the owners had "a legally sufficient time in which they could have taken reasonable measures to address the problem is properly one for the jury" and that a jury could reasonably have concluded that two days were sufficient), and cases cited therein. I note that it is unclear from the record in this case whether sufficient time had passed in which the landlord could have evicted Morton.
[2] The RESTATEMENT (SECOND) OF TORTS ง 323 (1965) states:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.